402

## STATE OF VERMONT *v.* DAVID BOSWORTH.

Turnpike inspectors may order repairs of a road, making it wider than it was when first made and accepted, and may order the erection of railings where there were none before, if such order does not require the corporation to do more than their charter requires.

An act of the legislature, practiced under and submitted to for thirty years, and sanctioned by one decision of the supreme court, is to be considered constitutional.

The act authorizing the appointment of turnpike inspectors is not unconstitutional, because it affects grants previously made.

Turnpike inspectors may be appointed at a term of the county court, holding after the first day of December, although the term commenced before that day.

This was an indictment, as follows, for shutting a turnpike gate which had been set open by turnpike inspectors.

'STATE OF VERMONT, *Windsor county, ss.*

'Be it remembered, that at the session of the county court 'begun and holden at Woodstock, within and for the said 'county of Windsor, on the last Tuesday of May, A. D. '1840,—

'The Grand Jurors within and for the body of said coun-'ty, now here in court, duly empannelled and sworn, upon 'their oath present, that at the term and session of said coun-'ty court begun and holden at Woodstock, within and for 'said county of Windsor, on the last Tuesday of November, 'A. D. 1838, there was, and ever since hath been, a certain 'turnpike road leading from Royalton meeting house to 'Woodstock court house, in said county, known and called 'by the name of the Royalton and Woodstock Turnpike, 'which road was made and kept up in pursuance and by vir-'tue of a certain act of the legislature of this state, entitled '"An act establishing a corporation by the name of Royalton '"and Woodstock Turnpike Company," passed on the 7th 'day of November, A. D. 1800. And the said county court, 'at their session last aforesaid, did, pursuant to the statute in 'such case made and provided, appoint Ptolemy Edson, of 'Chester, Simon Warren, of Woodstock, and John S. Mar-'cy, of Royalton, all judicious freeholders in said county of 'Windsor, inspectors of turnpike roads within said county, for 'the year then next ensuing, who then and there accepted said

'appointment, and were duly qualified therefor, and entered
'upon the discharge of the duties of said office. And after-
'wards, to wit, on the 22d day of April, A. D. 1839, the
'whole of said turnpike road was ruinous and out of re-
'pair, to such a degree that the good people of this state
'could not, with safety and convenience, travel thereon, with
'their horses, oxen, carts, wagons, and carriages; and the
'same road was not then in such repair as it reasonably
'ought to have been; and said turnpike corporation then had
'and kept a turnpike gate for the collection of toll on that
'part of said turnpike road which lies within the said town
'of Woodstock. And afterwards, to wit, at said Woodstock,
'on the day and year last above mentioned, more than three
'freeholders of said county, to wit, Titus Hutchinson, Asaph
'Fletcher, John A. Pratt, Samuel L. Chase, and others, free-
'holders of said county, made their application in writing to
'the said inspectors of turnpike roads, praying that said turn-
'pike inspectors would inspect said road, and order such re-
'pairs to be made upon the same as said inspectors should
'consider ought to be made, and set open, and take effectual
'meaures to keep open, all the gates upon said road, until all
'the repairs said inspectors might order to be made upon said
'road should be fully made. And the said turnpike inspec-
'tors, pursuant to said application and the statutes of this
'state, in such case made and provided, did, on the second
'and third days of May, A. D. 1839, examine and inspect
'said turnpike road, and, on such examination, it was then
'and there the opinion of said inspectors, that the said turn-
'pike road was not in such repair as the same reasonably
'ought to be; and the said turnpike inspectors, to wit, the
'said Edson, Warren, and Marcy, did, on said 3d day of
'May, A. D. 1839, at Woodstock, in said county, order and
'direct a general repair of said road, which said order was
'in writing, signed by said inspectors, bearing date the day
'and year last aforesaid, and was in substance, as follows,
'that is to say:'—

[Here followed a copy of the order, which, among other
things, directed that the road should be made eighteen feet
wide on the travelled part, in certain specified places; that
the company clear out of said road, between certain dwelling
houses in Pomfret, "all the logs and stones that lie near the

surface of the travelled part of said road;" that they erect good, substantial railings, stating the distances and places where such railings should be erected, and "that they remove or cover over all rocks and stones and logs lying on the travelled part of said road, and near the surface, the whole length of said road, so that they shall not annoy the traveller." And further ordering and directing "that the gate on said turnpike road, in Woodstock, be immediately opened and kept open, and that no gate be shut upon said road until all the repairs herein ordered are made and completed."]

' And afterwards, to wit, at Woodstock aforesaid, on the ' same 3d day of May, A. D. 1839, the said inspectors did ' deliver, at the toll-house and gate of said corporation, in ' Woodstock, aforesaid, which toll-house was then and there ' occupied and tenanted by one David Bosworth and his fa- ' mily, of Woodstock, aforesaid, who acted as toll-gatherer of ' said corporation at said gate, into the hands of one Mr. ' Parkhurst, (whose given name is to the jurors aforesaid un- ' known,) who occasionally, and on that day, acted as toll- ' gatherer for said corporation, at their said gate in Wood- ' stock, a copy of the aforesaid order, in writing, of said in- ' spectors ; and said inspectors did then and there open said ' gate, and order and direct that the same be kept open, and ' that no gate be shut upon said road till all the repairs men- ' tioned in their said order in writing, so left with said cor- ' poration, as aforesaid, were made and completed.   Where- ' by the said corporation, as well as the said David Bosworth, ' had notice of said order of said inspectors, and it was the ' duty of said corporation, and of said Bosworth, toll-gatherer, ' as aforesaid, to suffer and permit said gate to be and remain ' open until all the repairs, so ordered by said inspectors, as ' aforesaid, were fully completed, and until permission for ' shutting the same should first be obtained from said inspec- ' tors, or from a majority of them, or from two judges of the ' county court for said county of Windsor.

' And the jurors aforesaid, upon their oath aforesaid, do ' further present, that afterwards, to wit, at Woodstock afore- ' said, on the 27th day of June, in the said year of our Lord ' 1839, the said David Bosworth, then and still of Wood- ' stock, aforesaid, well knowing the premises, and before the ' said turnpike company had made and completed the repairs,

' so by said inspectors ordered to be made, as aforesaid, on ' said road, and without any permission for so doing from said ' inspectors, or any two of them, or from any two judges of ' the county court for said county of Windsor, did shut the ' gate, so opened, and ordered to be and remain open, by said ' inspectors, as aforesaid ; to the evil example of all others in ' like cases offending, contrary to the form, force and effect of ' the statutes in such case made and provided, and against the ' peace and dignity of the state.'

Plea, not guilty.

On the trial in the county court, the respondent introduced testimony tending to show that, by the charter or act of incorporation of said Turnpike Company, it was provided that when the turnpike was completed, it was to be accepted by the judges of the county court, and that in fact it was completed and accepted by the judges of said court; that some of the repairs ordered by the inspectors, in their order in the indictment mentioned, were alterations of the road from what it was when accepted by said judges, in this,—in some places the road was ordered to be made wider than it was when accepted, and railings were ordered to be put up for long distances, where none had ever been on said road, and that no new changes in the land or road had taken place.

The act incorporating said turnpike company, passed Nov. 6, 1800, was read in evidence, the second section of which enacts, ' that so soon as said turnpike road shall be sufficient- ' ly made, and shall be allowed and approved by the judges ' of the county court, or a committee by them appointed, said ' corporation shall be at liberty to erect two gates on the ' same ; and they be and hereby are entitled to receive from ' each traveller or passenger the following rates of toll at each ' of said gates,' (specifying the rates of toll). The third section authorizes the company to erect any additional gate or gates, and to average the toll allowed by the act. The fifth section enacts ' that if said corporation or toll-gatherer, or ' any other person in their employment, shall unreasonably ' delay or hinder any traveller or passenger, at either of said ' gates, or shall demand and receive more toll than is by this ' act established, the corporation shall forfeit and pay a sum ' not exceeding ten dollars, nor less than one dollar, to be re-

'covered before any court proper to try the same. And said 'corporation shall be liable to pay all damages which may 'happen to any person from whom the toll is demandable, or 'any other person, from neglect of any bridge or want of re-'pairs in said road, and shall be liable to presentation by the 'grand jury for not keeping the same in repair.'

The eleventh section provides that, after fifteen years from the completion of said road, the judges of the supreme court shall examine the books and accounts of said corporation, and if they shall find that the toll received shall have reimbursed to said corporation all expenditures for making said road and keeping it in repair, with an interest at the rate of twelve *per cent. per annum* upon said expenditures, it shall be the duty of said judges to dissolve said corporation, &c.

The respondent requested the court to charge the jury that if they found the facts proved which the testimony of the respondent tended to prove, their verdict should be for the respondent. But the court instructed the jury that the order made by said inspectors was lawful and binding until reversed or superseded, though it did order improvements beyond the condition of the road when first accepted. The jury returned a verdict of guilty, and the respondent excepted to the charge of the court.

The respondent then moved in arrest of judgment for the following causes :

1. Because the appointment of said inspectors was void, the county court having no authority to make such appointment at their November term.

2. Because the order made by said inspectors was inoperative and void, as they exceeded their powers.

3. Because the act of the legislature, passed Oct. 30, 1806, (see Comp. Stat. Slade's Ed. p. 479,) under and by virtue of which said inspectors were appointed and assumed to act, was inoperative and void, so far as related to the Royalton and Woodstock turnpike company.

The county court overruled the motion, to which decision, also, the respondent excepted.

*Tracy & Converse* for respondent.

We contend the charge of the court to the jury was erroneous.

By the charter of the corporation, it is provided that the judges of the county court were to decide upon the sufficiency of the road, and when approved of by them, the corporation were at liberty to erect, at least, two gates and recieve tolls. The decision of the judges was conclusive and final on that subject. But if the turnpike inspectors have the power claimed for them, they can render entirely nugatory the decision of the judges. If they can shut gates for want of such a state of repair as the judges deemed unnecessary and unreasonable, ten years after the decision of the judges, they can ten minutes after, and thus, in effect, reverse their decision, and, indeed, destroy the whole benefit of the franchise, and this, too, although the inspectors received their appointment at the hands of these very judges.

As to the motion in arrest.

1. There is no authority in the county court to make an appointment of turnpike inspectors, except what is conferred by the statute of 1806. That act should receive a strict construction. It is, so far as relates to this case, a penal statute. That statute prescribes the session of the court at which the appointment shall be made, and we conceive that a compliance with that requisite is as essential to the validity of the appointment as any other. What, then, is the session of the county court next after the first day of December, 1838? The May term, surely. Could a legal appointment be made at any other term of the court? Surely not. No more than freeman's meeting for the election of state officers could be holden in January.

2. The inspectors exceeded their authority in ordering repairs. The different portions of their order were contradictory and repugnant to each other. In one portion of their order they decree that the stone and logs near the surface of the ground should be *dug out and removed* and in another portion that they *be covered up or removed.*

3. This corporation is not bound by the provisions of the acts of 1806, and 1807, providing for the appointment of inspectors of turnpikes, their charter having been granted in 1800, and not subject to any future action of the legislature, without their consent, in any matter affecting their chartered rights and immunities. That the legislature had no right to pass any law to take away, impair, or abridge the

chartered rights of this corporation, will not, at this time, be denied. Were, then, the acts of 1806 and 1807, under which these inspectors were appointed, of that character? We say they most clearly were. The charter, (sections 2 and 11) gave them the right, after completing the road to the satisfaction of the county court, to erect two gates, and keep them up, and to receive from each traveller or passenger the rate of toll therein prescribed, for, at least, fifteen years, and until the corporation had been reimbursed their expenses, and twelve *per cent.* interest.

The acts of 1806 and 1807 provide for the taking down the gates, stopping the toll, altering the rate of toll, and, in short, destroying all that is valuable in the franchise, not by the supreme court, by virtue of their general power to vacate and annul charters for an abuse of their franchise, but by a tribunal unknown to the constitution, and, till then, unknown to the state, receiving their appointment, not by election of the people, not by the legislature, not by appointment of the corporation, or in which they had any voice, but by the county court.

By their charter, (section 5,) the corporation are made liable to individuals for damages occasioned by want of repairs, and are also liable to indictment by the grand jury. These are the remedies provided for the injuries both of a public and private character, occasioned by a breach of duty of the corporation in not keeping the road in repair, or delaying or hindering individuals or the public. In one case, a suit is commenced, stating the injury complained of; thirty days notice is given, and the court and jury hear the testimony and decide the case. In the other, the grand jury first decide whether the corporation shall be put upon trial at all. If they decide that they shall, then the corporation are entitled to a trial by the traverse jury, as other criminals are.

By the act, of 1806 and 1807, (Statute, 479 and 481,) the corporation are subjected to an inquisitorial visitation at any time, and at all times, whenever three freeholders shall say so, not only of their road, but of their books of record, so far as to see the rate of toll at the several gates, and may alter them as they see fit. Their gates are liable *to be thrown open and effectually kept open*, as long as it may suit the *whim, caprice, taste* or *malevolence*, even, of this new tribunal,

and from their judgment or decree there is no appeal, and for their errors or abuses, there is no remedy.. They are their own *witnesses, judges and jurors.* They are required to give no notice to the corporation, that they may be heard and defend before them, till after they have passed sentence of condemnation against them, and thrown open or thrown down their gates.

Again, the acts upon which we are commenting, did not transfer from the courts of justice (the constituted tribunals of the land) the jurisdiction over these corporations to this new board of inquisition, but the court retained all their authority over them and all their power to punish them. This new tribunal was superadded with independent and extensive discretionary powers. The result is, the corporation is punished by the inspectors, by setting open their gates and a loss of their toll, as long as it may suit them, and payment of costs. For the same offence they are indicted by the grand jury and punished by fine. If any individual is injured or delayed, he sues and recovers his damages.

Again, when this charter was granted, provisions were made to secure the rights of the public and individuals against any injury or abuse of the corporation. Under those provisions and with reference thereto, individuals subscribed for stock, and expended large sums of money. It was then a binding contract between the government and the corporation, made and executed upon the terms and conditions prescribed in the charter. And can one of the parties, without the consent of the other, afterwards impose other and further conditions, and subject the other to burdens, expenses and liabilities not contemplated by the charter? Such a doctrine is alike abhorent to reason and common justice, and, as we conceive, a flagrant violation of the constitution. *Dart. Col. Case.* Angel & Ames on Cor. 503. 2 Mass. 143.

This is an indictment against respondent for doing nothing more that what he has a right, and even what would have been his duty to do under the charter, and the general laws of the state, as they existed at the time the charter was made. By subsequent legislation, to make that penal, which, at the granting of the charter was perfectly innocent, we say partakes of the nature of an *ex post facto law,* and is therefore inadmissible.

WINDSOR, *February,* 1841.

State
*v.*
Bosworth.

*E. Hutchinson,* States attorney, for prosecution, contended,

1. That the time fixed by the statute of 1806, for appointing turnpike inspectors, was merely directory to the court, and that if the appointment was in fact made in term time after the first of December, it was valid, though the term of the court commenced its session previous to that day.

2. The toll-gatherer cannot be permitted to judge over the solemn doings of the county court, nor the doings of the inspectors. If the company are aggrieved by the inspectors' decree or order, they have their remedy by an appeal to two judges of the county court.

3. The act of 1806, embraces the then existing turnpike companies, as well as future ones.' For this cause it cannot be held unconstitutional. The legislature had power to place the turnpike companies, then existing, under the supervision of inspectors, and such supervision can be exercised over these corporations, nuisances as they are, their charters being perpetual. There can be no constitutional difficulty, none to those even, who lay so much stress on what are termed vested rights. Instead of disturbing such rights, the placing of these corporations under wholesome regulations aids much in carrying out the true intent of the grants. This is a *conservative* and not a *destructive* doctrine. By these charters the public good was intended to be promoted through individual enterprise.

4. There was nothing in the charge of the court below of which the respondent can complain, for the inspectors had power to order such alterations in the road as the wants of the country demanded. But, had the inspectors in some particulars exceeded their powers, still the company were bound to make such repairs as the inspectors had legally ordered. The case shows that most of the repairs directed to be made were clearly within the powers of the inspectors, as admitted by the respondent; at least, no objection was taken on the trial to any thing, except that some of the repairs were alterations from the road as it was originally made and accepted. Most clearly, the company were bound to make such repairs as were legal, before they could have even an excuse for setting the order of the inspectors at defiance. The order was binding upon the company until reversed or

vacated, and especially upon the respondent, who was their mere servant.

5. The indictment seems to be free of all the defects complained of in the case. *State* v. *Day,* 3 Vt. R. 138.

The opinion of the court was delivered by

Williams, Ch. J.—In this case there has been a verdict of guilty rendered against the respondent. On the trial certain exceptions were taken to the charge of the court. There was, also, a motion in arrest of judgment for the insufficiency of the indictment, which was overruled by the county court, to which there are also exceptions.

The exceptions, taken at the trial, bring in question the powers of the inspectors of turnpikes, and the effect of the acceptance of the road by the judges of the county court, and, in considering them, we are to assume that the appointment of the inspectors was legal, and the act, under which they were appointed, unobjectionable.

By the act of incorporation, the company were to make the road as required, and were not at liberty to erect gates until this was done. The legislature provided a tribunal, which, in this charter, was the judges of the county court, to accept the road when made. The object of this was to enable the company to erect gates and take toll. This tribunal could not dispense with the obligations imposed on the company by their charter, absolve them from any of the duties or liabilities they were under, nor impose any new duties on them. When they were satisfied that the conditions of the grant were so far complied with that it was proper a gate should be erected on the road, their acceptance of the road authorized the company to erect such gate. The sufficiency of the road thereafter, or the state of repair in which it might be, must necessarily be affected by the changes in the business of the country, which might increase or diminish the amount of travel thereon. We think, therefore, that it was competent for the turnpike inspectors to order them to make such repairs, as were necessary at the time of the order to render the road sufficient for the safety and convenience of travellers, without regard to the state of the road as first made ; but they could not require them to go beyond their charter, and make the road any wider than was requir-

ed.  The charge of the court was to this effect and is unobjectionable.

The motion in arrest sets forth three causes for which the indictment should be adjudged insufficient, and directly puts in issue the legality of the appointment of inspectors and the constitutionality of the act authorizing their appointment.

The first cause alleged presents a question on which I have entertained considerable doubt.  It appears that the inspectors were appointed at a session of the court, begun and holden on the last Tuesday of November, 1838, whereas the law requires the court to make the appointment at their first session after the first day of December.  It is highly probable that this occurred in consequence of the court having, heretofore, appointed them when the term in this county was held on the first Tuesday of December, and the court continued to appoint them at the same term after its commencement was altered to the last Tuesday in November; and it is probably true, as was suggested in the argument, that the term of the county court now usually continues beyond the first day of December.  As the office was an annual one, and the inspectors were required annually, at the session of the court in which their year shall expire, to lay a correct account of their services before the court; it was not improper nor illegal for the county court, if their session continued after the first day of December, to make the appointment, though the term commenced before that day.

The inspectors are public officers.  The power of appointment is given to the county court.  The time or term when this power is exercised, cannot be of any particular importance.  The act was, undoubtedly, directory to the several courts, in the first instance, to make the appointments the first session after the judges entered upon the duties of their respective offices on the first day of December, in each year.  Any vacancies were to be filled by the judges out of term time.  It was the duty of the court to make the appointments in such a manner that the inspectors, by them appointed, should hold their offices for a year.  We are, therefore, of the opinion that the appointment was regular if made by the court at their regular session; that the appointment cannot be considered void, if made at any regular term of the court, if the court were in session after the first day of De-

cember, so that the inspectors should hold their offices for one year. The legislature are required to make their several appointments of judges, justices, &c., at *their* first session after their election, and yet when they have held adjourned sessions, heretofore, they have made appointments to the office of justice of the peace, and other offices, where there was no vacancy, as well as to fill vacancies.

The second cause assigned is evidently unfounded, as the order is not liable to the impuation of inconsistency in the particular alleged. The order to clear out *all* the logs and stones in a section of the road, is not inconsistent with the general order, at the close, to remove or cover over all rocks, and stones, and logs, the whole length of the road, so that they should not annoy the traveller, as the latter clause meant only such as could not be removed. Or if both parts meant the same thing, the first clause would be embraced in the last and would not render the order void.

With respect to the third exception, it might be sufficient to say that the act was passed thirty-four years since, and had, and was designed to have, an operation on the existing grants. Indeed, most of the turnpike companies were incorporated before that time, and but a few since. It has been submitted to,and no attempt made to question its legality in the judicial tribunals but once, and then it was established. Questions arising under the constitution, settled by a long and uniform practice, and sanctioned by a judicial decision, should be considered as at rest. If not so, in my apprehension, our written constitution, instead of being a security for individual rights, would be a most dangerous instrument to be made use of for their destruction,and none are more interested to have this so considered than those artificial persons, called corporations,which are created by the legislature. Such questions are often of doubtful solution, on which men of the best intentions and of the most powerful intellects,may entertain different opinions. No questions arise more frequently, in this country,than those which involve the construction of the constitution, and the powers of the different branches of the government, and on many of these there is, no doubt, an honest difference of opinion. Where, then, is the security of individual or corporate rights if these questions are to be considered as always open ; if no acquiescence, even though saction-

Windsor,<br>
February,<br>
1841.<br>
<hr>
State<br>
v.<br>
Bosworth.

ed by a judicial decree, is to be considered as settling them ?

On the question arising in this case, the highest judicial tribunal in this state has once decided. It was susceptible of so much doubt, that there was not, nor is it to be expected there should have been, a perfect unanimity. Suppose we, or, as the case might be, a bare legal majority of the court, should decide differently ? Those who succeed us may think our predecessors more correct than we and adopt their decision, and thus leave this corporation, and all the people of the state, who may be affected by the grant made to them, in a state of utter and hopeless uncertainty as to their rights, powers, and privileges. If such questions are not to be considered as settled by a judicial decision, made by a divided court, what security have any corporation that the rights which they consider as settled by a judicial determination, may not be invaded by the legislature, and the powers of the legislature be considered as more extensive than they were in the first decision ? It is needless to say any more on this head, as it must be a very clear case, and one unsusceptible of doubt, which would lead us to disturb the question which was once settled by those who held these seats before us. And the fact that either a legal or constitutional question is one of great uncertainty, and a decision, either way, might be sustained, or be subject to animadversion, is a reason why one decision should be considered as settling it.

Perhaps something more in relation to the question itself ought to be said, and our determination should not be based entirely on the fact that there has been one adjudication of the subject ; and we have no objection to saying, that we do not consider the act, providing for the appointment of turnpike inspectors, as such an invasion of the corporate rights of the several turnpike companies previously granted, or such a destruction of their chartered rights as to render it obnoxious to the objection that it is *ex post facto*, or impairs the obligation of contracts. The object of such grants is to provide good roads for the accommodation of the public, and, as an equivalent therefor, to enable the company to take, as toll, a compensation for making and keeping the road in repair. It is the duty of the company to comply with the requirements of the act, and it is also the duty of the legislature to

see that they do comply with it, and it is, at least, questionable whether they could part with all control over them without a dereliction of the duty they owe to the public. The company was, by their charter, made liable to individuals for private damages, the same as towns, and were also subject to an indictment. The object of the act, of 1806, was to compel a performance of the duty undertaken by the corporation, in a different manner from what it was before, and is nothing more than a change of the remedy. Can turnpike inspectors order repairs, and, if not made, set open their gates and deprive them of their toll? They were before liable to a pecuniary penalty to an indefinite extent, and more onerous than any deprivation of their toll. Is it to be supposed that the inspectors will act wantonly and maliciously, and that the judges of the county court, from similar motives, will refuse relief? It may equally be supposed that the grand jury will indulge in caprice in preferring an indictment, and the same judges will impose fines so as to exhaust all the funds of the company. Neither supposition, however, is to be tolerated; but we are to believe that all officers, whether inspectors, prosecutors, or grand jurors, will not be unmindful of their oaths, to do equal right and justice to all men. It is too frequently the case, particularly has it been so when interests or rights of this company have been investigated, to complain of a disposition on one side to invade all private rights, and to indulge in a spirit of hostility to corporations, and, on the other, to complain that these corporations are nuisances, hostile to the interests of the public and at war with their feelings and convenience. On this, it is sufficient to remark that such complaints are inappropriate to this house, except when it is occupied for a different purpose than the one for which we are assembled. The possibility of an abuse of a right, or the actual abuse of power, is no argument against its existence. I have arrived at an advanced period of life, when it is usual to draw comparisons between the present and the past, to the disadvantage of the former. I have heard repeated complaints of the abuse and danger from monopolies and incorporations, and, on the other hand, of the danger of all their rights being prostrated before popular excitement; and I have no hesitation in saying, as my belief, that the principles of civil liberty are more re-

WINDSOR,
February,
1841.

garded, and individual and chartered rights more firmly secured and protected now, than when I first commenced active life. I should have no fears, therefore, of the effect of our decision, in this respect, whether it was for or against this respondent.

The decision of the county court was correct, both in their charge to the jury, and in overruling the motion in arrest. Judgment must, therefore, be rendered on the verdict.