JOHN S. THORPE *v.* THE RUTLAND AND BURLINGTON RAILROAD COMPANY.

*Power of the legislature to alter or repeal charters of private corporations; their police powers. Railroad companies, how far subject to legislative control; their obligation to maintain cattle guards, &c.*

The several legislatures of the American states possess the same extent of legislative power as the British parliament, except in those particulars where they are restricted by the provisions of the constitution, either of the state or of the United States.

The parliament of Great Britain may alter or repeal the charter of a private corporation.

There is no restriction upon the legislature of Vermont in that respect, except that of the state constitution forbidding to take private property without compensation, and that of the constitution of the United States prohibiting the states from passing laws impairing the obligation of contracts.

The legislature has the same control in regard to the business and profits of a corporation, which it has to that of natural persons.

A corporation having a joint stock, owned by private persons, is a private corporation, and its essential franchise is private property, which the legislature has no power to destroy or essentially modify, and it cannot be taken for public use without compensation.

 

Thorpe *v.* R. & B. R. Company.

The essential franchise of a railroad company is the right to operate their road, and receive fare and freight.

The entire power of legislative control is reserved unless expressly, or by necessary implication, restricted in the charter, and for a consideration. A corporation takes nothing by intendment but what is necessary to the enjoyment of that which is expressly granted.

The legislature has the power to require existing railroad corporations, and all hereafter incorporated to maintain cattle-guards at all crossings, or to respond in damages for all cattle injured by their trains, through such omission. This subject comes clearly within the police of the state, the power to regulate which resides inalienably in the state legislature.

This police power extends to the regulation and control of the entire business of railroads, so as to prevent needless injury to persons or property.

The legislature may by general laws, impose such obligations and restrictions upon railroads in regard to their business, and for the security of public interests, as to materially affect their profits.

The requirement of cattle-guards at farm-crossings, as a part of a division fence between adjoining occupants, falls legitimately within legislative authority.

So, too, it is but a proper security for the lives of domestic animals, which forms a proper subject of legislation.

And it is but a reasonable security to others against a dangerous business, which the legislature may justly require.

ACTION ON THE CASE to recover damages for sheep of the plaintiff killed by one of the defendants' locomotives, upon their railroad track, where said sheep had escaped in consequence of there being no cattle-guard at a farm crossing, across the defendants' railroad on the plaintiff's land in Charlotte. The only question reserved at the trial in the county court was, whether the defendants were bound by the provision in the general railroad act of 1849, requiring railroad companies to construct and maintain cattle-guards;* there being no such obligation imposed upon the defendants by their charter, which was granted in 1843.

The county court, November Term, 1854,—PECK, J., presiding,—decided and instructed the jury that the defendants were bound by said provision, to which the defendants excepted.

---

*Which is in these words: "Each railroad corporation shall erect and maintain fences on the lines of their road, * * * * and also construct and maintain cattle-guards at all farm and road crossings, suitable and sufficient to prevent cattle and animals from getting on to the railroad. Until such fences and cattle-guards shall be duly made, the corporation and its agents shall be liable for all damages which shall be done by their agents or engines to cattle, horses, or other animals thereon, if occasioned by want of such fences and cattle-guards."—(Comp. Stat. 200 §41.)

*D. A. Smalley* for the defendants, argued that the defendant's charter was a contract conferring certain rights and imposing certain obligations, which could not be added to or varied without the defendants' consent; that the act of 1849, or general railroad law, if allowed to act retrospectively, would impair and alter the defendants' rights under their contract, and impose obligations upon them which they never assumed, and that it should therefore be held inoperative as to the defendants, and cited 2 Kent, 272, 306–7. 2 Pet. Con. 321. 4 Do. 559, 566. 5 Do. 386. 2 Howard, 672. 6 Do. 320. 2 Mass. 143. 10 Do. 439. 10 Barb. 89.

*J. Maeck,* for the plaintiff.

The defendants are bound by the provisions of the general law. (Comp. Stat. 200, §41.) These provisions are mere police regulations, which the legislature had a right to make, and they in no way impair the grant to the defendant. *Lyman* v. *Boston & Wor. R. Co.,* 4 Cush. 288. *Galena & Chicago R. Co.* v. *Loomis,* 13 Ill. 548. *State* v. *Bosworth,* 13 Vt. 402. *Nelson* v. *Vt. & C. R. Co.* 26 Vt. 717.

The opinion of the court was delivered, at the circuit session, in September, 1855, by

REDFIELD, Ch. J.    I. The present case involves the question of the right of the legislature to require existing railways to respond in damages for all cattle killed or injured by their trains until they erect suitable cattle-guards at farm-crossings.    No question could be made where such a requisition was contained in the charter of the corporation, or in the general laws of the state at the date of the charter.    But where neither is the case, it is claimed that it is incompetent for the legislature to impose such an obligation by statute, subsequent to the date of the charter.

It has never been questioned, so far as I know, that the American legislatures have the same unlimited power in regard to legislation which resides in the British parliament, except where they are restrained by written constitutions.    That must be conceded, I think, to be a fundamental principle in the political organizations of the American states.    We cannot well comprehend how, upon principle, it should be otherwise.    The people must of course, possess

all legislative power originally. They have committed this in the most general and unlimited manner to the several state lgislatures, saving only such restrictions as are imposed by the constitution of the United States, or of the particular state in question. I am not aware that the constitution of this state contains any restriction upon the legislature in regard to corporations, unless it be that where "any person's property is taken for the use of the public, the owner ought to receive an equivalent in money;" or that there is any such restriction in the United States constitution, except that prohibiting the states from "passing any law impairing the obligation of contracts."

It is a conceded point, upon all hands, that the parliament of Great Britain is competent to make any law binding upon corporations, however much it may increase their burdens or restrict their powers, whether general or organic, even to the repeal of their charters.

This extent of power is recognized in the case of *Dartmouth College* v. *Woodward*, 4 Wheaton 518, and the leading authorities are there referred to. Any requisite amount of authority, giving this unlimited power over corporations to the British parliament, may readily be found. And if, as we have shown, the several state legislatures have the same extent of legislative power, with the limitations named, the inviolability of these artificial bodies rests upon the same basis in the American states with that of natural persons, and there are, no doubt, many of the rights, powers, and functions of natural persons which do not come within legislative control. Such, for instance, as are purely and exclusively of private concern, and in which the body politic, as such, have no special interest.

II. It being assumed then, that the legislature may control the action, prescribe the functions and duties of corporations, and impose restraints upon them to the same extent as upon natural persons, that is, in all matters coming within the general range of legislative authority, subject to the limitation of not impairing the obligation of contracts, provided the essential franchise is not taken without compensation, it becomes of primary importance to determine the extent to which the charter of a corporation may fairly be regarded as a contract within the meaning of the United States constitution.

Upon this subject, the decisions of the United States supreme

court must be regarded as of paramout authority. And the case of *Dartmouth College* v. *Woodward*, being so much upon the very point now under consideration, and the leading case, and authoritative exposition of the court of last resort upon that subject, must be considered as the common starting point, the point of divergence, so to speak, of all the contrariety of opinion in regard to it.

Mr. Chief Justice MARSHALL there says, " a corporation is an atificial being—the mere creature of the law—it possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence." The decision throughout treats this as the fundamental idea, the pivot upon which the case turns. The charter of a corporation is thus regarded as a contract, inasmuch as it is an implied undertaking on the part of the state, that the corporation, as such, and for the purposes therein named or implied, shall enjoy the powers and franchises by it charter conferred. And any statute essentially modifying these corporate franchises is there regarded as a violation of the charter. But when we come to inquire what is meant by the franchises of a corporation, the principal difficulty arises. Certain things, it is agreed are essential to the beneficial existence and successful operation of a corporation, such as individuality and perpetuity, when the grant is unlimited; the power to sue and to be sued, to have a common seal and to contract; and in the case of a railroad, to have a common stock to construct and maintain its road, and to operate the same for the common benefit of the corporators. Certain other things, as incident to the beneficial use of these franchises, are necessarily implied. But there is a wide field of debateable ground outside of all these. It is conceded that the powers expressly, or by necessary implication, conferred by the charter, and which are essential to the successful operation of the corporations are inviolable.*

But is has sometimes been supposed that corporations possess a kind of immunity and exemption from legislative control, extend-

*The supreme court of Ohio, in *Mechanics' and Traders' Bank* v. *Debolt*, 1 Ohio, 591, have even denied this, and in argument assume the right of the legislature to repeal the charter of banking corporations. So, also, in *Toledo Bank* v. *Bond*, *Ibid.*, 622. But these cases involve only the right of the legislature to grant away, permanently, for a consideration, the right of taxation, which seems to me not to involve the general question.

ing to everything materially affecting their interest, and where there is no express reservation in their charters. It was upon this ground that a perpetual exemption from taxation was claimed in *Providence Bank* v. *Billings*, 4 Peters, 514, their charter being general, and no power of taxation reserved to the state. The argument was, that the right to tax either their property or their stock was not only an abridgment of the beneficial use of the franchise, but if it existed, was capable of being so exercised as virtually to destroy it. This was certainly plausible, and the court do not deny the liability to so exercise the power of taxation as to absorb the entire profits of the institution. But still they deny the exemption claimed· Chief Justice MARSHALL there says: "The great object of an incorporation is, to bestow the character and properties of individuality on a collected and changing body of men. Any privileges which may exempt it from the burdens common to individuals, do not flow necessarily from the charter, *but must be expressed in it, or they do not exist.*"

This is sufficiently explicit, and upon examination will be found, I think, to have placed the matter upon its true basis. In reason, it would seem that no fault could be found with the rule here laid down by the great expounder of American constitutional law. As to the general liability to legislative control, it places natural persons and corporations precisely upon the same ground. And it is the true ground, and the only one upon which equal rights and just liabilities and duties can be fairly based.

To apply this rule to the present case, it must be conceded that all which goes to the constitution of the corporation and its beneficial operation is granted by the legislature, and can not be revoked, either directly or indirectly, without a violation of the grant, which is regarded as impairing the contract, and so prohibited by the United States constitution. And if we suppose the legislature to have made the same grant to a natural person which they did to defendants, which they may undoubtedly do, *Moor* v. *Veasie*, 32 Maine 343 ; S. C. in error in the Sup. Ct. U. S., 4 Peters 568, it would scarcely be supposed that they thereby parted with any general legislative control over such person, or the business secured to him. Such a supposition, when applied to a single natural person, sounds almost absurd. But it must, in fact, be the same thing when

11

applied to a corporation, however extensive. In either case, the privilege of running the road, and taking tolls, or fare and freight, is the essential franchise conferred. Any act essentially paralizing this franchise, or destroying the profits therefrom arising, would no doubt be void. But beyond that, the entire power of the legislative control resides in the legislature, unless such power is expressly limited in the grant to the corporation, as by exempting their property from taxation, in consideration of a share of the profits, or a bonus, or the public duties assumed. And it has been questioned how far one legislature could, in this manner, abridge the general power of every sovereignty to impose taxes to defray the expense of public functions. *Brewster* v. *Hough*, 10 New Hamp. 138; *Mechanics' and Traders' Bank* v. *Debolt*, 1 Ohio, 591; *Toledo Bank* v. *Bond*, *Ibid.*, 622. It seems to me there is some ground to question the right of the legislature to extinguish, by one act, this essential right of sovereignty. I would not be surprised to find it brought into general doubt. But at present it seems to be pretty generally acquiesced in. *State of New Jersey* v. *Wilson*, 7 Cranch, 164; reaffirmed in *Gordon* v. *Appeal Tax Court*, 3 Howard, 133. But all the decisions in the United States supreme court, allowing the legislature to grant irrevocably any essential prerogative of sovereignty, require it to be upon consideration, and in the case of corporations, cotemporaneous with the creation of the franchise. *Richmond R. Co.* v. *The Louisa R. Co.*, 13 Howard, 71. Similar decisions in regard to the right of the legislature to grant perpetual exemption from taxation to corporations and property, the title to which is derived from the state, have been made by this court; *Herrick* v. *Randolph*, 13 Vt. 525; and in some of the other states, *Landon* v. *Litchfield*, 11 Conn. 251, and cases cited, *O'Donnell* v. *Bailey*, 24 Miss. 386. But these cases do not affect to justify even this express exemption from taxation being held inviolable, except upon the ground that it formed a part of the value of the grant, for which the state received or stipulated for a consideration.

But in the present case the question arises upon the statute of 1850, requiring all railways in the state to make and maintain cattle-guards at farm crossings, and until they do so, making them liable for damage done to cattle by their engines, by reason of defect of

fences or cattle-guards. The defendant's charter required them to fence their road, but no express provision is made in regard to cattle-guards. There is no pretense of any express exemption in the charter upon this subject, or that such an implied exemption can fairly be said to form a condition of the act of incorporation, unless everything is implied by grant, which is not expressly inhibited, whereas the true rule of construction in regard to the powers of corporations is, that they are to take nothing by intendment, but what is necessary to the enjoyment of that which is expressly granted. In addition to the cases already cited, we may here refer to the language of the opinion of GRIER, Justice, in *Richmond R. Co.* v. *Louisa R. Co.*, 13 Howard, 71, citing from the former decisions of the court with approbation, " that public grants are to be construed strictly, that any ambiguity in the terms of the grant must operate against the corporation and in favor of the public, and the corporation can claim nothing but what is clearly given by the act." This being the definitive determination of the court of last resort, upon this subject, in so recent a case, should be regarded as final, if there be any such thing anywhere. And the language of TANEY, Chief Justice, in *Charles River Bridge* v. *Warren Bridge*, 11 Peters, 548, is still more specific, and in my judgment eminently just and conservative: "The continued existence of a government would be of no great value, if by implications and presumptions it was disarmed of the powers necessary to accomplish the ends of its creation, and the functions it was designed to perform transferred to privileged corporations." The conclusion of this learned judge and eminent jurist is, that no claim in any way abridging the most unlimited exercise of the legislative power over persons, natural or artificial, can be successfully asserted, except upon the basis of an express grant, in terms, or by necessary implication.

But upon the principle contended for in *Providence Bank* v. *Billings (supra)*, and sometimes attempted to be maintained in favor of other corporations, most of the railways in this state would be quite beyond the control of the legislature, as well as to their own police, as that of the state generally. For in very few of their charters are these matters defined, or the control of them reserved to the legislature. Many of the charters do not require the roads

to be fenced. But in *Quimby* v. *The Vermont Cent. R. Co.*, 23 Vt. 387, it was considered that the corporation were bound, as part of the compensation to land owners, either to build fences or pay for them. The same was also held in *Morse* v. *Boston and Maine R.* 2 Cush. 536. Any other construction will enable railroad corporations to take land without adequate compensation, which is in violation of the state constitution, and would make the charter void to that extent. So, too, in regard to farm-crossings, the charters of many roads are silent. And it has been held that the provision for restoring private ways does not apply to farm-crossings. But the railways, without exception, built farm crossings, regarding them as an economical mode of reducing land damages, and they are now bound to maintain them, however the case might have been if none had been stipulated for, and the damages assessed accordingly. *Manning* v. *Eastern Counties Railway Co.*, 12 M. & W. 237. So, too, many of the charters are silent as to cattle-guards at road-crossings, but the roads generally acquiesced in their necessity, both for the security of property and persons upon the railroad and of cattle in the highway. For it has been held that this provision is for the protection of all cattle in the highway. *Fawcet* v. *The York and North Midland R. Co.*, 2 Law & Eq. 289; *Trow* v. *Vermont Cent. R. Co.*, 24 Vt. 487. Thus making a distinction in regard to the extent of the liability of railways for damages arising through defect of fences, and farm-crossings, and cattle-guards, at those points, and those which arise from defect of fences, and cattle-guards at road-crossings, the former being only for the protection of cattle, rightfully in the adjoining fields, as was held in *Jackson* v. *R. & B. R. Co.*, 25 Vt. 150, and the other for the protection of all cattle in the highway, unless perhaps, in some excepted cases, amounting to gross negligence in the owners. And there can be no doubt of the perfect right of the legislature to make the same distinction in regard to the extent of the liability of railways in the act of 1850, if such was their purpose, which thus becomes a matter of construction.

But the present case resolves itself into the narrow question of the right of the legislature, by general statute to require all railways, whether now in operation, or hereafter to be chartered, or built, to fence their roads upon both sides, and provide

sufficient cattle-guards at all farm and road-crossings, under penalty of paying all damage caused by their neglect to comply with such requirements. It might be contended that cattle guards are a necessary part of the fence at all crossings, but that has been questioned, and we think the matter should be decided upon the general ground. It was supposed that the question was settled by this court, in *Nelson* v. *V. & C. R. Co.*, 26 Vt. 717. The general views of the court are there stated as clearly as it could now be done, but as the general question is of vast importance, both to the roads and the public, and has again been urged upon our consideration, we have examined it very much in detail.

We think the power of the legislature to control existing railways in this respect, may be found in the general control over the police of the country, which resides in the law-making power in all free states, and which is, by the fifth article of the bill of rights of this state, expressly declared to reside perpetually and inalienably in the legislature, which is, perhaps, no more than the enunciation of a general principle applicable to all free states, and which cannot, therefore be violated so as to deprive the legislature of the power, even by express grant to any more public or private corporation. And when the regulation of the police of a city or town, by general ordinances, is given to such towns and cities, and the regulation of their own internal police is given to railroads to be carried into effect by their by-laws and other regulations, it is, of course always, in all such cases, subject to the superior control of the legislature. That is a responsibility which legislatures cannot divest themselves of, if they would.

This police power of the state extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the state. According to the maxim, *Sic utere tuo ut alienum non laedas*, which being of universal application, it must of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others. So far as railroads are concerned, this police power which resides primarily and ultimately in the legislature, is two-fold : 1. The police of the roads, which, in the absence of legislative control, the corporations themselves exercise over their operatives, and to some extent over all who do business

with them, or come upon their grounds, through their general statutes, and by their officers.   We apprehend there can be no manner of doubt that the legislature may, if they deem the public good requires it, of which they are to judge, and in all doubtful cases their judgment is final, require the several railroads in the state to establish and maintain the same kind of police which is now observed upon some of the more important roads in the country for their own security, or even such a police as is found upon the English railways, and those upon the continent of Europe.   No one ever questioned the right of the Connecticut legislature to require trains upon all their railroads to come to a stand before passing draws in bridges; or of the Massachusetts legislature to require the same thing before passing another railroad.   And by parity of reason may all railways be required so to conduct themselves, as to other persons, natural or corporate, as not unreasonably to injure them or their property.   And if the business of railways is specially dangerous, they may be required to bear the expense of erecting such safeguards as will render it ordinarily safe to others, as is often required of natural persons under such circumstances.

There would be no end of illustrations upon this subject, which, in the detail are more familiar to others than to us.   It may be extended to the supervision of the track, tending switches, running upon the time of other trains, running a road with a single track, using improper rails, not using proper precaution by way of safety beams in case of the breaking of axle-trees, the number of brakemen upon a train with reference to the number of cars, employing intemperate or incompetent engineers and servants, running beyond a given rate of speed, and a thousand similar things, most of which have been made the subject of legislation or judicial determination, and all of which may be.   *Hegeman* v. *Western R. Co.,* 16 Barbour, 353.

2. There is also the general police power of the state, by which persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health, and prosperity of the state, of the perfect right, in the legislature to do which no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned.   And it is certainly calculated to excite surprise and alarm, that the right

to do the same in regard to railways should be made a serious question. This objection is made generally upon two grounds: 1. That it subjects corporations to virtual destruction by the legislature; and 2. That it is an attempt to control the obligation of one person to another, in matters of merely private concern.

The first point has already been somewhat labored. It is admitted that the essential franchise of a private corporation is recognized by the best authority as private property, and cannot be taken without compensation, even for public use. *Armington* v. *Barnet* 15 Vt. 745; *West River Bridge Co.* v. *Dix*, 16 Vt. 446; S. C. in error in the United States Sup. Ct.; 6 Howard, 507; 1 Shelford (Bennett's ed.) 441, and cases cited.

All the cases agree that the indispensable franchises of a corporation cannot be destroyed or essentially modified. This is the very point upon which the leading case of *Dartmouth College* v. *Woodward* was decided, and which every well considered case in this country maintains. But when it is attempted upon this basis to . deny the power of regulating the internal police of the railroads, and their mode of transacting their general business, so far as it tends unreasonably to infringe the rights or interests of others, it is putting the whole subject of railway control quite above the legislation of the country. Many analagous subjects may be adduced to show the right of legislative control over matters chiefly of private concern. It was held, that a statute making the stockholders of existing banks liable for the debts of the bank was a valid law as to debts thereafter contracted, and binding to that extent, upon all stockholders, subsequent to the passage of the law. *Stanley* v. *Stanley*, 26 Maine, 191. But where a bank was chartered with power to receive money on deposit, and pay away the same, and to discount bills of exchange, and make loans, and a statute of the state subsequently made it unlawful for any bank in the state to transfer by endorsement or otherwise, any bill or note, etc., it was held that the act was void, as a violation of the contract of the state with the bank in granting its charter. *Planters' Bank* v. *Sharp*, and *Baldwin* v. *Payne*, 6 Howard, 301, 326, 327, 332; *Jameson* v. *Planters' and Merchants' Bank*, 23 Alabama, 168. Is is true that any statute destroying the business or profits of a bank, and equally of a railroad, is void. Hence a statute prohibiting banks from taking

interest, or discounting bills or notes, would be void, as striking at the very foundation of the general objects and beneficial purposes of the charter. But a general statute reducing the rate of interest, or punishing usury, or prohibiting speculations in exchange or in depreciated paper, or the issuing of bills of a given denomination, or creating other banks in the same vicinity, have always been regarded as valid. And while it is conceded the legislature could not prohibit existing railways from carrying freight or passengers, it is believed that beyond all question, it may so regulate these matters as to impose new obligations and restrictions upon these roads materially affecting their profits, as by not allowing them to run in an unsafe condition, as was held as to turnpikes, *State* v. *Bosworth*, 13 Vt. 402. But a law allowing certain classes of persons to go toll free is void, *Pingrey* v. *Washburn*, 1 Aiken, 268. So, too, chartering a railroad along the same route of a turnpike is no violation of its rights, *White River Turpike Co*, v. *Vermont Cent. R. Co.*, 21 Vt., 590; *Turnpike Co.* v. *Railway Co.* 10 Gill & Johnson, 392; or chartering another railway along the same route of a former one, to whom no exclusive rights are granted in terms, *Matter of Hamilton Avenue*, 14 Barbour, 405 ; or the establishment of a free way by the side of a toll bridge, *Charles River Bridge* v. *Warren Bridge*, 11 Peters, 420.

The legislature, may no doubt, prohibit railroads from carrying freight which is regarded as detrimental to the public health or morals, or the public safety generally, or they might probably be made liable as insurers of the lives and limbs of passengers as they virtually are of freight. The late statute, giving relatives the right to recover damages where a person is killed, has wrought a very important change in the liability of railways, ten times as much, probably, as the one now under consideration ever could do. And I never knew the right of the legislature to impose the liability to be brought in question.

But the argument that these cattle-guards at farm-crossings are of so private a character as not to come within the general range of legislative cognizance, seems to me to rest altogether upon a misapprehension. It makes no difference how few or how many persons a statute will be likely to affect. If it professes to regulate a matter of public concern, and is in its terms general, applying

equally to all persons or property coming within its provisions, it makes no difference in regard to its character or validity, whether it will be likely to reach one case or ten thousand.   A statute requiring powder-mills to be built remote from the villages or highways, or to be separated from the adjoining lands by any such muniment as may be requisite to afford security to others' property or business, would probably be a valid law if there were but one powder-mill in the state, or none at all, and notwithstanding the whole expense of the protection should be imposed upon the proprietor of the dangerous business.   And even where the state legislature have created a corporation for manufacturing powder at a given point, at the time, remote from inhabitants, if in process of time dwellings approach the locality, so as to render the further pursuit of the business at that point destructive to the interests of others, it may be required to be suspended or removed, or secured from doing harm, at the sole expense of such corporation.   This very point is, in effect, decided in regard to Trinity churchyard, which is a royal grant for interment, securing fees to the proprietors, in the case of *Coates* v. *The City of New York*, 7 Cowen, 604; and in regard to *The Presbyterian Churchyard* in their case v. *The City of New York*, 5 Cowen, 538.

So, too, a statute requiring division fences between adjoining land proprietors, to be built of a given height or quality, although differing from the former law, would bind natural persons and equally corporations.   But a statute requiring land owners to build *all their fences* of a given quality or height, would no doubt be invalid, as an unwarrantable interference with matters of exclusively private concern.   But the farm-crossings upon a railway are by no means of this character.   They are division fences between adjoining occupants, to all intents.   In addition to this, they are the safeguards which one person, in the exercise of a dangerous business, is required to maintain in order to prevent the liability to injure his neighbor.   This is a control by legislative action coming within the obligation of the maxim, *Sic utere tuo*, and which has always been exercised in this manner in all free states, in regard to those whose business is dangerous and destructive to other persons, property or business.   Slaughter-houses, powder-mills, or houses for keeping powder, unhealthy manufactories, the keeping

of wild animals, and even domestic animals, dangerous to persons or property, have always been regarded as under the control of the legislature. It seems incredible how any doubt should have arisen upon the point now before the court. And it would seem it could not, except from some undefined apprehension, which seems to have prevailed to a considerable extent, that a corporation did possess some more exclusive powers and privileges upon the subject of its business, than a natural person in the same business, with equal power to pursue and to accomplish it, which, I trust, has been sufficiently denied.

I do not now perceive any just ground to question the right of the legislature to make railways liable for all cattle killed by their trains. It might be unjust or unreasonable, but none the less competent. *Girtman* v. *Central Railroad*, 1 Kelly, (Georgia) 173, is sometimes quoted as having held a different doctrine, but no such point is to be found in the case. The British parliament for centuries, and most of the American legislatures, have made the protection of the lives of domestic animals, the subject of penal enactment. It would be wonderful if they could not do the same as to railways or if they could not punish the killing, by requiring them to compensate the owner, or, as in the present case, to do it until they used certain precautions in running their trains, to wit, maintained cattle-guards at roads and farm-crossings.

There are some few cases in the American courts bearing more directly upon the very point before us. In *Suydam* v. *Moore*, 8 Barbour, 358, the very same point is decided against the railway; WILLARD, J., compares the requirement to the law of the road, the passing of canal boats, and keeping lights at a given elevation in steamboats, and says it comes clearly within the maxim *Sic utere tuo ;* and in *Waldron* v. *The Renssalaer & Saratoga R. Co.*, *Ibid.* 390, the same point is decided, and the same judge says the requirements of the new act, which is identical with our statute of 1850, as applied to existing railways, "are not inconsistent with their charter, and are, in our judgment, such as the legislature had the right to make." They were designed for the public safety, as well as the protection of property. In *Milliman* v. *The Oswego & Syracuse R.*, 10 Barbour, 87, the ground is assumed that the new law was not intended to apply to existing roads. And no doubt is here

intimated of the right of the legislature to impose similar regulations upon existing railways. The N. Y. Revised Statutes subject all corporate charters to the control of the legislature, but it has been there considered, that this reservation does not extend to matters of this kind, but that the right depends upon general legislative authority. The case of *The Galena and Chicago Union R. Co.* v. *Loomis,* 13 Illinois, 548, decides the point that the legislature may pass a law, requiring all railways to ring the bell or blow the whistle of their engines immediately before passing highways at grade. The court say, " The legislature has the power, by general laws, from time to time as the public exigencies may require, to regulate corporations in their franchises, so as to provide for the public safety. The provision in question is a mere police regulation, enacted for the protection and safety of the public, and in no manner interferes with, or impairs the powers conferred on the defendants in their act of incorporation." All farm-crossings in England are required to be above or below grade, so as not to endanger passengers upon the road, and so of all road-crossings there, unless protected by gates. I could entertain no doubt of the right of the legislature to require the same here as to all railways, or even to subject their operations to the control of a board of commissioners, as has been done in some states. In *Benson* v. *New York City*, 10 Barbour, 223, it was held, that a ferry, the grant to which was held, not under the authority of the state, but from the city of New York, and which was a private corporation, as to the stock, might be required by the legislature to conform to such regulations, restrictions and precautions as were deemed necessary for the public benefit and security. The opinion of WOODBURY, Justice, in *East Hartford* v. *Hartford Bridge Co.*, 10 Howard, 511, assumes similar grounds, although that case was somewhat different. The case of *Swan* v. *Williamson*, 2 Michigan, 427, denies that railways are private corporations. But that proposition is scarcely maintainable so far as the pecuniary interest is concerned. If the stock is owned by private persons, the corporation is private so far as the right of legislative control is concerned, however public the functions devolved upon it may be. The language of MARSHALL, Chief Justice, in *Dartmouth College* v. *Woodward*, 4 Wheaton, 518, 629, seems pertinent to the general question of what laws are prohibited on the

ground of impairing the obligation of contracts; "That the framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government, and that the instrument they have given us is not to be so construed, may be admitted." And equally pertinent is the commentary of Parsons on Contracts, 2 vol. 511, upon the provision of the United States constitution in relation to the obligation of contracts. "We may say that it is not intended to apply to public property, to the discharge of public duties, to the possession or exercise of public rights, nor to any changes or qualifications in any of these, which the legislature of a state may at any time deem expedient."

We conclude then, that the authority of the legislature to make the requirement of existing railways may be vindicated, because it comes fairly within the police' of the state; 2. Because it regards the division fence between adjoining proprietors; 3. Because it properly concerns the safe mode of exercising a dangerous occupation or business; and 4. Because it is but a reasonable provision for the protection of domestic animals, all of which interests fall legitimately within the range of legislative control, both in regard to natural and artificial persons.   Judgment affirmed.*

BENNETT, J., dissenting.

*There are some analogous subjects where legislative control has been sustained by the courts which may properly be here alluded to. The expense of sidewalks and curbstones in cities and towns has been imposed upon adjacent lots, chiefly for general comfort and convenience. *Paxson* v. *Swett*, 1 Greenleaf 196; *City of Lowell* v. *Hadley*, 8 Metcalf, 180. Unlicensed persons not allowed to remove house-dirt and offal from the streets. Vandine's Case, 6 Pick. 187. Prohibiting persons selling produce not raised upon their own farms, from occupying certain stands in the market. Nightingale's Case, 11 Pick. 168. See also *Buffaloe* v. *Webster*, 10 Wendell, 99; *Bush* v. *Seabury*, 8 Johns, 327. Prohibiting the driving or riding horses faster than a walk in certain streets. *Commonwealth* v. *Worcester*, 3 Pick. 462. Prohibiting bowling alleys. *Tanner* v. *The Trustees of the City of Albion*, 5 Hill, 121, or the exhibition of stud horses or stallions in public places. *Nolin* v. *Mayor of Franklin*. 4 Yerger, 163. The same may be said of all statutes regulating the mode of driving upon the highway or upon bridges, the validity of which have long been acquiesced in.

The destruction of private property in cities and towns, to prevent the spread of conflagrations, is an extreme application of the rule, compelling the subserviency of private rights to public security, in cases of imperious necessity. But even this has been fully sustained after the severest scrutiny.   v. *Lawrence*, and other cases upon the same subject; 1 Zabriskie, 714; 3 Zabriskie, 590, and cases there referred to from the New York Reports. There is, in short, no end to these illustrations, when we look critically into the police of the large cities. One in any degree familiar with this subject would never question the right depending upon invincible necessity, in order to the maintenance of any show of administrative authority among the class of persons with which the city police have to do. To such men any doubt of the right to subject persons and property to such regulations as the public security and health may require, regardless of merely private convenience, looks like mere badinage. They can scarcely regard the objector as altogether serious. And generally, these doubts in regard to the extent of governmental authority come from those who have had small experience.