Ebeeiian, J.,
delivered tlie opinion of tlie conrt:
The defendant was presented by the grand jnry of •’Williamson county for taking toll, as gate-keeper, on the USTo-lensville and Nashville Turnpike, of a party passing through the toll gate, on his way to mill, with grain for his family use. «
We suppose this proceeding was instituted as a case to test the rights of the company and the citizen, and as such, is one of general interest. It is claimed to be sustainable under sec. 1437 of the Code [1858], which is as follows;
“But no toll shall be claimed or taken from any person passing from one part of his farm to another part thereof; or from persons going to or from funerals, or places of worship; or to or from election precincts, at which such person is entitled to vote; or to or from militia musters, if required to do militia duty; or from a grist null, with grain for family use; or from any person traveling on foot.” [Substantially the same exemptions in Shannon’s Code, sec. 2463.]
It is pretty clear, from the reading of this section, that by a fair construction, it only applies to the particular toll gates authorized by the previous section, 1434, and regulated as to their charges at such gates by sec. 1436. The first section is taken from the Act of 1849-50, ch. 72, sec. 18, and provides: “That turnpike companies have the right to erect one toll gate for every five miles of road; to place them on such parts of the road as they may deem best, but not nearer an incorporated town than one mile and one-half, nor within four miles of each other; and to erect such gates as fast as sections of five miles from either terminus are completed.” [See now Shannon’s Code, secs. 2456, 2461, and the Acts of 1897, chs. 56, 65,109].
Then follows sec. 1436 [now fixed in sec. 2454 of Shannon’s Code], fixing the rate of tolls: “Such companies *552 may collect” — which rate is different from that provided for such gates as are authorized in many of the turnpike charters — “as to gates authorized by such charters.” After this follows the section we have quoted, on which this presentment is based, providing, “But no toll shall be claimed or taken,” in the cases cited, one of which is, “from parties going to or from a grist mill with grain for family use.”
It is shown in the proof in this case that the company had never accepted this act as an amendment to their charter, but always acted under its original provisions, except in charging less in some cases, since the change of coinage, as by taking 5 cents where they were entitled to 6 1-4, and 10 cents where they were entitled to 12 1-2 cents.
But waiving this aspect of the case, and assuming, as argued, that this section is a general regulation for all turnpikes in the state, the question is, can it be sustained as valid and binding on a company, the charter of which had been passed, accepted, and the company organized under it, before the passage of the Act of 1849 — 50, which charter prescribed the right to take toll of all persons without limitation, and fixed the rates of such toll, or provided for specified tolls in particular cases?*
The ISTolensville and Hashville Turnpike Company was incorporated by an act of the legislature, in 1836, and had, by the second section of the act, conferred on it all the rights of a previous charter granted to the Franklin Turnpike Company. By the seventh section of the latter act, it is provided what shall be charged for passing along said road, and the amount fixed in each case therein specified, among which tilings, is a two-wheeled carriage, 12 1-2 cents. And such seems to have been the vehicle in the case now before us. <
It is now admitted in argument that, the charter is a contract, and as such, cannot be impaired, and, indeed, it is too late now to argue that question. Whatever might *553 be thought of the soundness of the principle in the Dartmouth College ease, as an original question, it has been so long acquiesced in, so often applied, and interwoven itself so completely into our jurisprudence, that it can probably never be disturbed by legislative or judicial action. If its results work injury, the remedy must be sought and applied in the exercise of the sovereign power of the people, by a change of the constitution of the United States. We need not refer to authorities on this question. It has been too often discussed, and the principle applied by -this court, to need further support.
The right to take the tolls prescribed in the charter must be taken as one of the terms of the contract, and the investment of the moneys of the corporators in building the road, in consideration of the benefits and privileges thus granted. This being so, the contract must stand intact, and the rights granted remain without diminution, not subject to impairment by any law without consent of the in-corporators, unless some other rule of law can be brought to bear upon the question under which action by the legislature can be sheltered and protected. It is insisted -that under what is known as the police power, the section of the Code can be maintained. This power in the state is one settled mid conceded by our courts, and by standard authors on the subject of constitutional law, but, at the same time, one that is exceedingly difficult to define with precision, so as to include all that is within its scope, and exclude, rigidly, all that is beyond it. Mr. Cooley, in his work on “Constitutional Limitations,” page 572 [6th ed., p. 704], attempts to define this power. He says:
“The police of a state, in a comprehensive sense, embraces its system of internal regulation, by which the state seeks not only to preserve the public order, and to prevent offenses against the state, but also to establish for the intercourse of citizens with citizens, those rules of good manners and good neighborhood, which are calculated to *554 prevent a conflict oí rights, and to insure to each, the uninterrupted enjoyment of his own, so far as is reasonably consistent with like enjoyment of rights by others.”
These generalities may include all that is involved in the power render consideration, but we are compelled to say, to our minds, lack that definiteness and precision that should be given to the statement of a legal proposition. We do not feel much assisted by it in arriving at the limitations or extent of the power referred to; a more accurate definition, perhaps, is found on page 573 [6th ed., p. 706], cited from an opinion by Redfield [in Thorpe v. Railroad, 27 Vt., 140, 149], which is as follows:
“This police power of the state extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the state. . . By this general police power of the state, persons and property aré subjected to all kind of restraints and burdens, in order to secure, the general comfort, health, and prosperity of the state.”
Without hazarding a definition that shall attempt to include all that fall under this power, we would say it is the exercise of a power on the part of the legislature, of general regulation’ of all its citizens, natural or artificial, in subordination to the public interest, but so as not to interfere with or impair the rights of any to the fullest enjoyment of personal liberty, security, and property, consistent with like enjoyment of such rights on the part of all others.
However, passing from these general definitions, let us see what is the rule as applicable to rights under a charter contract. The rule is as well stated on this subject, on page 577 [6th ed., p. 710], as it can probably be found anywhere. After laying down the doctrine that these charters are contracts, and as such, cannot be impaired, he says:
“The limit to the exercise of the police in these eases must be this: the regulations must have reference to the *555 comfort, safety, or welfare of society; tbey must not be in conflict writb any of tbe provisions of tbe charter; and tbey must not, under pretense of regulation, take from tbe corporation any of tbe essential rights which tbe charter confers. In short, they must be police regulations in fact, and not amendments of tbe charter, in curtailment of tbe corporate franchise.”
In other words, the true principle is, that the corporation may be subject, like an individual, to regulation as to the manner of enjoyment of his rights, so as to subordinate his enjoyment of them to the interest of the general public; but this must be so done as to leave his corporate privilege intact, not lessened or impaired in value. Regulation in its enjoyment is the rule, the enjoyment of the right being always implied. Regulation,- not deprivation, is the principle that underlies all the cases on this question [the exercise of the police power].
"We need but apply this rule to the case before us to see that the section of the Code, as applicable to companies having charters fixing the right to charge in particular cases, and the amount of such charges, cannot be sustained as to any such specified charter right. By the charter, a two-wheeled carriage is subject to a toll of 12 1-2 cents. No exception is made in favor of such vehicles when going to mill or anywhere else. The section, if applied to such companies, would deprive them of this right in all cases where the parties were on any of the missions referred to in it. This is not to regulate, but to deprive; not to say how a thing may be enjoyed, but to say in these cases it shall not be enjoyed at all. This is to take from the corporation a privilege clearly granted, and not regulate its use. And this we hold is forbidden by the constitution of the United States, as impairing the obligation of the contract.
We need not answer the argument, very ingeniously and forcibly put by the counsel, that the company took the charter, subject, by fair implication, to such regulation as *556 might be deemed proper for tbe public good. We concede tbe principle to be sound, so far as regulation is concerned, but it does not include, nor cannot include, tbe case before us, of entire deprivation of a granted right. Tbis would be to accept a grant of a privilege witb tbe understanding that it is to be revoked by tbe power granting it whenever it deemed tbe public interest demanded it. Such revocation of essential rights must always be provided for by the contract itself, by general law, or by tbe constitution of tbe state before tbe passage of tbe act of incorporation, or else tbe corporate rights must remain inviolate.
We have not cited cases in support of the views above laid down, as they are generally familiar to the profession. Tbe cases bolding that “shun pikes” could not be established, so as to avoid paying tolls at turnpike gates, in our state, go on the same principle we have announced. It is, that tbe company shall not, by any device or regulation, be deprived of what tolls their charters have given them tbe right to receive.
Tbe judgment convicting tbe party must be reversed, and tbe case remanded for a new trial.