THOMAS S. MARR et al. *v.* BANK OF WEST TENNESSEE.

1. **BANKS.** *Liabilities of subscribers for stock.* By the general banking Act of 1859-60, the original subscriber is liable for the amount of his subscription until the same is paid up, whether he retains or assigns the stock, and this applies to subscribers for stock in a bank chartered before the passage of the Act, although the charter contained no such provision.

2. **SAME.** *General Banking Act Constitutional.* The Act is not unconstitutional, because impairing the obligation of a contract. It does not assume to take away the power to assign stock, but simply to regulate its transfer; imposes no new obligations or restrictions, but prescribes the conditions upon which the original stockholders might assign their stock.

3. **SAME.** *Stock. Liability of assignor and assignee.* The assignees of such unpaid stock are first liable, and if the amount cannot be collected from them, then their assignors, who were original subscribers, are liable.

Marr *v*. Bank of West Tennessee.

4. SAME. *Liability of stockholders. Discharge in bankruptcy.* The liability of a stockholder is a fixed, definite sum, and is provable before a bankrupt court, and a discharge in bankruptcy will release such stockholders from liability.

5. SAME. *Stockholders. Payment in depreciated bills.* Where a bill is filed to settle the respective liabilities of stockholders in an insolvent bank, and a stockholder has paid his stock in depreciated bills of the bank, he should only be credited with the value of said bills at the time of payment.

6. SAME. *Unpaid stock. Statute of limitations.* The statute of limitations will not commence to run until a call has been made for the unpaid stock.

7. SAME. *Stockholder. Judgment.* Any stockholder who is an assignee of a judgment rendered in favor of a noteholder, may have his liability extinguished *pro tanto* by said assigned judgment.

## FROM SHELBY.

Appeal from the Chancery Court at Memphis. T. W. BROWN, Sp. Ch.

Solicitors: WRIGHT & FOLKES, D. E. MYERS, W. M. RANDOLPH, GEO. GANTT, J. B. HEISKELL, W. M. SMITH, M. P. JARNAGIN, W. P. WILSON and others.

DEADERICK, C. J., delivered the opinion of the Court.

In February, 1854, the Legislature of Tennessee chartered the Bank of West Tennessee, and in March, 1854, books for subscription of stock were opened, and, as the minutes of the proceedings of said bank recite, 8,000 shares of stock of $100 each were subscribed for, and ten per cent. per share, or $80,000, paid. This sum was ordered to be deposited in the banking house of Cherry,

Caldwell & Co. A month later five directors were elected, and a week thereafter C. W. Cherry was elected President, having received all the votes, say 301. About a year after the election of Cherry as President, the next entry appears, and shows a meeting of the stockholders, on the 4th of April, 1855, showing five stockholders. Cherry owned 8,496 shares and the other four one share each, there having been, as recited, 500 additional shares subscribed, making a total of 8,500. All the stockholders were elected Directors, and Cherry made President. On the 12th of April, 1855, the Directors met, and were informed that Cherry had tranferred his stock, but to whom does not appear, and his seat was declared, thereby, to be vacant, then each of the Directors successively resigned, and the vacancies were filled as they occurred. On the 12th of June, 1855, a new President was elected to fill the vacancy which had occurred on the 12th of April, 1855, and a Cashier were elected. March 17th, 1856, at a stockholders meeting, the proceedings of which are recorded in four lines, five Directors were elected. Whether these were other stockholders than those elected, or in what proportion the stock was then held, does not appear. At a meeting of Directors, April 26th, 1856, certificates of deposit for $20,000 were directed to be issued to pay for the charter and other expenses incurred. The next record is of a special meeting of Directors held March 13th, 1857, to ratify and confirm certificates of deposits

issued in February, 1857, and to cancel other cer-
tificates of deposits issued April 26th, 1857. From
this time to May 15th, 1858, four entries appear,
recording resignations of Directors and other of-
ficers, and election of new ones. At this date—
May 15th, 1858—it appears "sundry bills and
notes" were discounted. Thenceforth, to the 22nd
of November, 1858, similar entries appear, at which
last date it appears $52,000 in notes had been is-
sued. From the 22nd of November, 1858, to
the 19th of May, 1860, four entries appear; two
the 1st of December, 1858, and the 4th of January,
1859, recording discount of "sundry bills and notes."
On March 25th, 1859, the stockholders held a meet-
ing, at which Directors were elected, and by them
a President; and the other March 25th, 1860,
recording a stockholders meeting and the elec-
tion of Directors. On the 19th of May, 1860,
a number of resignations and election of Directors
took place, when P. C. Bethell, J. M. Williamson
and John A. Sannoner transferred to the Memphis
Insurance Company 7,995 shares of the capital
stock of the Bank of West Tennessee, which,
with one share each held by Apperson, Nelson,
Townsend, May and Church, making 8,000 shares,
is said to be the whole of the stock. Thus, 500
shares seem to have been dropped off from the
amount of capital stock.

T. A. Nelson and Ben May were elected Presi-
dent and Cashier. On the next day a committee
was appointed to receive the assets of the insur-

ance company, who were also authorized, in connection with Bethell and Williamson, to burn the old issues of the bank then in its possession.

On the 22nd of May, 1860, books were ordered to be opened to receive subscriptions to the capital stock of the bank, upon which five per cent. was to be paid, at the time of subscription, to Ben May, Receiver, and a call of ten per cent. was to be paid on the 1st of October next thereafter.

By-laws were adopted, one of which was that "any stock owned by a stockholder in this bank may be tranferred to any other person *on the transfer book of the bank,* the person making the transfer shall cease being a holder of such stock on signing said transfer, and the person to whom it is transferred shall, in all respects, assume the position of the person transferring such stock.. And such are the substantial provisions of the charter.

The reorganization of the bank was thus effected, and thereafter meetings were regularly held, and the ordinary business of banking institutions carried on until the bank was removed South under military orders, and by direction of the Board of Directors in May, 1862.

In this purchase the insurance company paid $30,000 for the charter, plates, etc., and an arrangement was made with Bethell and others, by which the bank was protected against the payment of any outstanding notes of the bank. The insurance company was absorbed by the bank, al-

though in form it had become the purchaser of
the stock of Bethell, Williamson and Sannoner,
yet the transaction was in substance and effect the
purchase of the charter under which an entirely
new organization was had. A new subscription
of stock was made to the amount of $780,800,
which was formally transferred by the insurance
company to the several subscribers, and upon this
new subscription of stock the bank operated. No
assets of the former organization were transferred to
the new. Under these facts, when the cause was
here in 1873, it was held that the bank was or-
ganized in May, 1860, although operating under a
charter granted in 1854, and that the subscribers
for stock in and after May, 1860, were the original
stockholders, as it appears that all the liabilities
of said bank, then and now outstanding, are those
created since the new organization. It is true
the meager record of the proceedings had under
the charter up to the transfer in May, 1860, recite
that $80,000 had been paid in upon subscriptions
of stock made, but we are satisfied, from an ex-
amination of the record, that this is not true in
point of fact, as there is nothing to show what
was done with this large sum, and it also appears
that expedients to raise money to defray expenses
were resorted to, and from the frequent shifting of
stock, which often appeared almost entirely in the
name of one person, and repeated changes of of-
ficers, indicate that the organization was more nom-
inal than real, and kept up, not for the purpose

of legitimate banking business, but with the view of speculation, until the transfer in May, 1860.

In the opinion of this Court, pronounced in 1873, it is said: " The assignment of stocks by the owner does not discharge him from liability. Upon the subscription it becomes corporate property, impressed with a trust in favor of the noteholders. It was in effect an agreement by the subscribers to pay into the bank the amount subscribed by him," etc.

The learned Special Chancellor, Hon. Thomas W. Brown, who rendered the decree from which an appeal was taken by a number of stockholders, held the language quoted as applying to the original, and not to intermediate assignors.

We accept his interpretation as correct, and even considering it as an original and open question in a well considered written opinion, he very ably sustains this view upon the ground of the application of the banking act of 1859–60. In terms this act holds the original subscriber liable until his subscription is paid up, whether he retain or assign the stock. It is objected, however, that no such provision is contained in the bank's charter, and as the charter antedates the act, and as the act imposes an obligation on original stockholders, not contained in the charter, it is inoperative, because it impairs the obligations of a contract, or restrains them from the exercise of a valuable privilege secured to them by the charter.

While it is true the State may not impair the

obligation of a contract or take from the corporation any essential right, which is conferred by the charter, yet it has been held that this inhibition against impairing the obligation of contracts, does not so far remove from State control the rights and properties which depend for their existence or enforcement upon contracts as to relieve from the operation of such general regulations, for the good government of the State, and the protection of the rights of individuals, as may be deemed important. All contracts and all rights are subject to this power, under the police power of this State. *Cool. Cons. Lim.* 574.

It was under this general power to regulate, that the Legislature of Vermont required each railroad and corporation to erect and maintain fences along the line of road, and cattle guards at farm and road crossings, and made the company and its agents liable for damages occasioned by the want of such fences and guards. As to corporations in existence before the passage of this act, it was objected that its effect was to modify, and to that extent, violate the obligation of the charter contract. But it was held that the power of the Legislature to control existing railways in this respect may be found in the general control over the police of the country, which resides in the law making power in all free States: *Ibid,* note 1, citing 27 Vt., 140. So laws may be passed to punish neglect or misconduct in managing ferries and to secure the safety of passengers from danger,

impositions, etc. But the State cannot take away the ferries: *Ibid*, 576, note 1. So it has been held in Maine and Massachusetts that a statute which makes the stockholders of an existing corporation liable for the future debts of the corporation does not infringe the chartered franchises of the corporation, but merely regulates the future relations of debtor and creditor, and is hence a valid exercise of legislative power: Thomp. Liability of Stockholders, sec. 65, citing a number of cases. In this case the act of the Legislature is a general law, applying expressly to all banks already chartered and those thereafter to be chartered. It does not assume to take away the power to assign stock, but simply to regulate its transfer; imposes no new obligations or restrictions, but prescribes the conditions upon which the original stockholders might assign their stocks, and if in the cases of railways and ferries the Legislature might impose obligations not specifically required in the charters of the company involving the outlay of money, and to that extent an injury, we see no reason why the Legislature may not, when the public good requires it, regulate the transfer of stock.

In this case the new organization was had after the enactment of the banking law, and with knowledge of its provisions.

But this question was settled by the former opinion and decree in this case, and is *res adjudicata*, the assignees in such cases being first liable

and if the amount due cannot be collected off them then their assignors who were original stockholders under the new organization will be liable. So if there be any new parties who were not included by the former opinion and decree, the same conclusion is reached now as then, and the Chancellor's decree on this question will be affirmed.

But it is objected that this question is not raised by the pleadings. The original bill expressly calls for a discovery as to the transfer of stock as to whom and by whom transferred. The primary object is to compel those liable to pay up the unpaid stock to satisfy complainants' claims, and prays for general relief. To this same end the cross bill was filed by order of this Court, and looking to the general scope and objects and prayers of both bills, we are of opinion they are sufficient to hold all the original, as well as present stockholders, liable.

The bank continued active operations in the conduct of ordinary banking business up to the time of its being taken south, May 28, 1862. Three dividends had been declared previous to this time, which were applied in payment of stocks. These payments by the opinion at the last term were declared valid, upon the ground the bank was then solvent. For the same reasons we are of opinion that any payments made upon stock previous to the bank being taken south should be allowed as valid payments, and all payments

made after that time and after the return of the bank, in 1865, should be credited at their value as compared with legal tender notes, at the time of payment.

Pending this suit several stockholders have obtained their discharges in bankruptcy, which they have pleaded in these cases. Solvent stockholders seek to hold such bankrupt parties liable, upon the ground that although their debt to the bank may be discharged, still they are liable to them to contribute to the discharge of the debts of the note-holders. That this is a new and subsequent liability from which they have not been discharged under the proceedings in bankruptcy, and that if it did in fact exist at the time of the bankruptcy discharge, it was impossible to ascertain its value, and that such claims, therefore, were not provable under the bankrupt law. On the other hand it is maintained that each stockholder is individually liable to the bank for the sum due upon his stock and no more. It is a several, not a joint liability, as to which each member stands liable for his own debt, and although if one stockholder pays more than his proportion of the debts of the company, he may compel contribution; yet if a stockholder is discharged from his liability to the company, he cannot be compelled to pay the amount of which he is discharged to another stockholder, that his liability to contribute begins and ends with his liability to the company.

Again it is insisted that if the solvent stock-

holder could be considered as standing in the relation of a joint surety for a common debtor to the bankrupt his claim was provable under the provisions of the bankrupt law, and not having been proved before the bankrupt's discharge cannot now be enforced against him. If a stockholder pays more than his proportion of the debts of the company he may have contribution from other shareholders who have not paid their just proportions.

But the liability of the stockholder is not a joint one, like that of sureties, equally bound for the same principal, where even a discharge of one from liability to the common creditor would not relieve him of liability to his co-sureties, who afterwards paid the whole debt. But the stockholder stands liable for a definite sum to the company and no more. It is a severable, unequal and limited liability as to which each member stands liable to the company or corporation and through it to creditors. Hence, if he pays up his own liability to the company or is discharged therefrom it terminates his liability as a stockholder, which cannot be revived at the instance of other stockholders. Such of the stockholders, therefore, as have been discharged in bankruptcy are released from liability

The learned special Chancellor has reached the same conclusion, upon very plausible reasoning, that the bankrupt's plea of discharge must prevail because contestants who now claim contribution

from them should have presented their claims and had them adjudged by the bankrupt court, as provable or rejected as not provable. Our statute of limitation has no application to actions to enforce payments of bills or notes issued for circulation as money: Code, sec. 2779. But the Chancellor is not required to hold the case open for an indefinite time, for filing notes by the creditors, but may fix a period beyond which no further leave to file such bills will be granted. The bill of Allen and others may be regarded as an original bill in the nature of a bill of review, filed to impeach decrees of the Chancery Court, and of this Court, for fraud.

Where a decree has been so obtained a court of chancery will relieve those who have been injured thereby.

It is alleged that Nelson and May, under whose exclusive management the bank had been since its removal south, and who had conducted the defense in behalf of stockholders against Marr's bill, and who had filed a cross bill to make all stockholders and bill-holders defendants, had assured complainants that they need not employ counsel in said bills, that they would attend to and protect their interests, but they say instead of protecting they disarmed them, and then obtained unjust decrees in their favor against their interest and to their prejudice. They therefore impeach said decrees by which May obtained judgment in his favor, to their injury, and Nelson's wife and daughter obtained judgment

through Nelson on issues of the bank, bought up by Nelson and claimed by him to have been bought with his wife's separate means, and so decreed, whereas it is alleged such issues were bought up with his own or issues belonging to the bank, he being at that time largely inbebted to the bank. The allegations as to the representations made by May and Nelson are substantially proved and proof taken which warranted the setting aside said decrees in favor of May, which was done by the Chancellor, and May has not appealed. The Chancellor also ordered a reference to the Master to hear and report as to whether the separate estate of the wife and daughter of Nelson paid for the issues on which judgment had been rendered in their favor. Some evidence having been taken, the Chancellor deemed it proper to attain the ends of justice that further enquiry should be made.

As to these matters the Chancellor's decree was correct.

Enough had been alleged in the cross bill and established by proof to show complainants had been prevented from employing counsel and making defense to said bills, by the representations of Nelson and May, and that they were injured thereby, and we approve and affirm the Chancellor's decree, in respect to May's claims, and in ordering a reference as to the claims of Nelson's wife and daughter.

Allen's bill also impeaches the decree in favor of J. M. Nelson, a son of said T. A. Nelson, in

whose favor a decree had been rendered on issues of the bank filed by him, and in refusing to hold him liable as a stockholder in said bank.

We are of opinion there is no ground to impeach the validity of said F. M. Nelson's claim to the judgment in his favor, on the issues of the bank. The evidence shows he bought and paid for them himself and they belonged to him. Nor is there sufficient evidence to hold him liable as a stockholder.

The stocks transferred to him on the books of the company was so transferred without his knowledge or consent, and was never accepted by him, although marked as paid up stock. As a clerk for May, for rather at his request, while the bank was being wound up as an insolvent institution in transcribing, he transcribed an entry of a large number of shares standing in his name as paid up stock. But he swears he did not claim them, nor know why they were transferred to him, and never did assert any claim to them, or by word or act accept or treat such stock as his own, and there is no evidence to contradict his statement, on the contrary it is sustained.

The Chancellor held that said F. M. Nelson was not liable on such stock, and we affirm his decree as to this matter.

Guild Deloach also appears as a stockholder, but it further appears that she was a minor when stock was subscribed for, and she relying upon that defense, it was properly held by the Chan-

cellor that no decree could be rendered against her.

The Chancellor has very fully considered and discussed the pleas of the several statutes of limitation relied upon by the personal representatives of deceased stockholders. He held the defense insufficient upon several grounds, one of which was, that no call was made for payment of stock. The statute does not commence to run until a call for the payment of the stock. This we regard as a conclusive argument against the defense, without considering or discussing the other grounds stated in the Chancellor's opinion.

P. C. Burford, a non-resident, died September 21, 1863. On the 2nd of October, 1865, S. R. Burford administered on his estate, and a few days thereafter paid what appeared to be the balance due on his intestate's stock, amounting to $11,235.71, in issues of the bank. S. R. Burford, the administrator, was a non-resident of the State at the time he administered, and has so continued to the present time. Marr's bill was filed the 16th of July, 1866, against a few named stockholders, and all the unknown stockholders, May, cashier, and Nelson, president, as directed by this Court, filed a cross bill, March 11, 1868, to bring all the stockholders before the Court, and P. C. Burford was named as a defendant therein. On the 6th of February, 1874, Thomas H. Allen and others filed their bill against all the stockholders and

their personal representatives, and to this bill S. R. Burford, administrator, etc., was made a defendant. He pleaded the several statutes of limitations in defense of the action and also relied upon his payment of said stock. Burford, the administrator, was out of the State when the cause of action accrued against him and so remained. By sec. 2762 of the Code it is provided if a cause of action shall accrue against any person, who shall be out of this State, the action may be commenced after his return, and the statute of limitations shall not run during absence from or residence out of the State.

This statute has been held to apply to administrators, 1 Lea, *Smith* v. *Arnold.* The bill by Allen and others, was filed amongst other things to bring in all stockholders and their representatives in order to settle their respective liabilities, and said Burford, administrator, was first brought before the Court by said bill, and he is by it for the first time called upon for payment of balance due upon his intestate's stock. Intestate had not been called on to pay it in his lifetime. The administrator is entitled to a credit on stock only to the amount of the value of the money paid in October 1865.

The decree against C. B. Church is erroneous, because we have announced in this opinion that all payments made upon stock and accepted previous to the removal of the bank south, to wit, (May 28, 1862) were valid and to be credited at

their nominal amount.    This was substantially held
by this Court, in 1873, and Church having paid
in full, 14th of May, 1862, is liable for nothing
more.    Of course this will apply to all similar
cases, if any there be.

As to S. B. Williamson and G. Falls the de-
cree is correct and will be affirmed.    It is insisted
that Williamson is not liable, because a decree
against his personal representatives was rendered
for $550, and paid, and no decree was rendered
against Falls, prior to the appeal of 1871 to this
Court, and complainant in cross bill did not ap-
peal.    But there is no adjudication in their favor,
and being parties to the said cross bill they are
liable to such other or further decrees as were
necessary to attain the objects of the bill.    The
petition of W. F. Taylor to be released in part
of the purchase of two judgments against M. A.
Allen, made to him under order of the Chancellor,
we are of opinion should have been granted.    The
receiver and Taylor both believed the smaller
judgment as well as the larger one was due and
unpaid at the time of the purchase and sale.    They
bargained under a mutual mistake.    The smaller
judgment had in fact been paid.    It is not right
that the vendor should again be paid for the same
thing.    Nor is it equitable that Taylor should pay
for it.    The decree will be corrected in respect to
this, abating the price according to the amount
agreed to be paid for both judgments.    Without
specifying the particular causes in which the ques-

tion arises, we hold that payments made on stocks before removal of the bank south in May, 1862, are valid, that present holders of stocks is first liable, then the original subscriber under the reorganization in May, 1860; that at the time of payment on stock in issues of the bank their value is to be estimated, not the time at which such issues were received, whether received in the due course of business or purchased. Any parties against whom judgments have been rendered, who are assignees of any judgments rendered in favor of note holders, may have the judgments against them extinguished *pro tanto* by said assigned judgments, in the discretion of the Chancellor. This direction to, or discretion of the Chancellor will not apply to the cases of Mrs. Nelson and her daughter, as to whose claims the Chancellor has directed further inquiry to be made, and which will be reported upon and further decided after this cause is remanded. It is believed that the general rules laid down, and principles applied to special cases, are sufficiently comprehensive to dispose of all questions arising upon these records, in this Court.

The Chancellor's decree, except so far as it may be modified by this opinion, will be affirmed, and the cause will be remand d for further proceedings, and the costs of this appeal will be paid out of the fund in the hands of the Master, or to be received hereafter.