Spear, J.
The ground urged for reversal of the judgments is that the law referred to is invalid because in violation of the constitution. If the law, as to the provisions involved in this iuquiry, is shown to be dearly, palpably in conflict with the constitution, so that there is no doubt or hesitancy in the mind of the court, it should be so held. But if there be any doubt upon the subject, that should be solved in favor of the law, and the court should decline to interfere; for if a law has-been enacted which is simply unwise and does not infringe upon any constitutional limitation, the only remedy is by resort to the law-making power to procure its repeal.
' The first section of the act provides, “ that in cities of the first grade of the first class, no person shall be engaged in any trade, business or profession hereinafter mentioned, until he or she shall have obtained a license therefor, as hereinafter provided.” The second section provides that “ any person who shall violate any of the provisions of this act, shall be *65 deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by fine,” etc. The section relating to vehicles, which is section 29, as amended March 25, 1884 (81 Ohio L. 78), provides that “the owners of all vehicles used upon the streets of the city, shall pay annual license fees as follows: * * for each one-horse cart, three dollars; for each one-horse dray or truck, five dollars; * * for each two-horse wagon used for hauling boilers, engines, safes, stone, brick, lumber, logs or merchandise, fifteen dollars; * * for each wagon not before mentioned, drawn by one horse, three dollars ; drawn by two horses, ten dollars; drawn by three horses, fifteen dollars; drawn by four horses, twenty dollars,” etc. The requirement is not to apply to vehicles used by farmers marketing the products of their farms, or for hauling produce into such city; nor to gardeners, fruit growers or florists; nor to any person living without such ■ city engaged in farming, gardening, or huckstering, hauling goods or merchandise to or from such city; nor to any person living without such city who may go in or out in any buggy, sulky or carriage; but dairymen living without are to pay license upon their vehicles used upon the streets, three dollars for a one-horse wagon, five for a two-horse wagon, and ten for a three or four-horse wagon. Section 22 requires every proprietor of a theater, concert hall, etc., to pay license according to seating capacity, varying from five dollars per day to two hundred dollars per year where the capacity is less than 975 persons; and over that number, from same amount per day to three hundred dollars per year. Section 26 requires keepers of livery, sale and boarding stables to pay license graded according to gross receipts; those whose annual receipts are $15,000 and over, twenty-five dollars, and those whose receipts are less than that sum, fifteen dollars. Section 35 requires every dealer in second-hand articles and keepers of junk shops to pay a license of fifty dollars.
It is objected that this act is of a general nature, and that it is void under section 26 of article 2 of the constitution, because it is limited in its operation to cities of the first grade *66 of the first class, and for that reason does not have a uniform operation throughout the state; that it is, therefore, a special act, and, inasmuch as it attempts to confer corporate powers, is in conflict with section 1 of article 13 of the constitution, which prohibits the general assembly from passing any special act conferring corporate powers, and with section 6 of the same article, which enjoins upon that body the duty of providing for the organization of cities and villages, and of restraining their powers of taxation, by general laws.
The law is not a special act. It is local and special as to the ends to be accomplished, but general in its terms and operation, applying to all cities of the first grade of the first class. It is not limited to such city as may have been in that class and grade at the date of its enactment. At that time Cincinnati was the only city in the state answering to the description; but there is a possibility, not to say certainty, that other cities in the state will increase in population, so that they will pass into this grade, and when that happens they will come within the provisions of this law. In this respect, the law differs essentially from that in review in the case of The State v. Mitchell, 31 Ohio St. 592. That law was made applicable only to cities of the second class, having a population of thirty-one thousand at the last federal census; and, inasmuch as Columbus was the only city in the state having that population, and as the act could apply alone to that city, and never to any other, and as it undertook to confer corporate powers, this court held it to be in conflict with section 1, of article 13, and therefore void. A like objection was found to exist against the act under consideration, in the case of The State v. Pugh, 43 Ohio St. 98; and the distinction above indicated is made apparent with great clearness and force in the opinion rendered by the present chief j ustice. The classification provided for by sections 1546 and 1547 of the Revised Statutes, has been sustained by repeated adjudications of this court, in cases involving questions as to the conferring of corporate powers, as to assessment, and as to governmental regulation, and it is too late now to question the validity of those sections. The city of Cincinnati comes within a class so constituted, and the law applies equally *67 to all of the class intended to be affected by it, and hence, within the spirit of the decisions referred to, has a uniform operation throughout the state. We need not stop to inquire whether the act does or docs not confer corporate powers. It is not open to the objection urged under this head.
Another objection, in substance like the one just considered, is, that the law undertakes to make criminal in one locality, an act which, elsewhere, would be innocent. Falk, Exp., 42 Ohio St. 638, is cited in support of this point. The act in review in that case sought to punish any person found in any city of the first grade of the first class, or within four - miles thereof, having burglar’s tools in' his possession. In the opinion of Okey, J., the power of the general assembly to pass penal statutes which are local and even special in character, is fully recognized. But, inasmuch as there could be no conviction under the law unless it were shown that the defendant had such possession to aid in the commission of an unlawful act when favorable opportunity presented, thus showing an act not merely immoral, but plainly vicious, and of a serious and dangerous character, a crime malum in se, a wrong to society in every part of the state, and one which might properly be made punishable by statute throughout the state, as a criminal offense, the legislation could not be maintained. The court regarded classification by population not proper classification with reference to the subject-matter of the act. Had the law dealt with acts merely mala prohibita, and had the provision been in the nature of police regulations, enacted for the purpose of enforcing legitimate local requirements, it is clear that a different question would have been presented. The offense which we are here considering is wholly different in its nature from that of which Falk was convicted. It is wrong only because prohibited, and the prohibition is of use only where the needs of dense population require it. In the rural districts, and in many of the smaller municipalities, no necessity for it exists.
It is further urged that the sections quoted are in conflict with section 2, of article 12, of the constitution, which provides that “ laws shall be passed taxing by a uniform rule all *68 moneys,” etc., “ according to its true value,” and is an attempt, under form of license, to raise money for general revenue. Section: 20, if regarded as imposing a tax, does not purport to tax property; neither does it. An owner may use, upon his own premises, and he may manufacture, and may sell any number of vehicles without coming within the provisions of this section. Only when he desires to use such vehicles upon the streets must he pay the annual license fee. And as to sections 22, 26 and 35, the same distinction may be made. As to theaters, wore this a tax on the property, every theater would have to pay, whether in operation or not, but the license is required only of those in operation. The burden is placed upon the occupation, and not upon the property used in the occupation. The power to tax or regulate by license arises from the general legislative power given by section 1, of article 2, of the constitution, and is not derived from section 2, of article 12. The latter section is but a limitation upon the taxing power, and it has been often held that the requirement of this section is simply that 'taxes upon property, as such, shall be by a uniform rule, but that this does not impair the power of the general assembly to use its discretion when the burden is not placed upon property. The last named section by no means exhausts the taxing power. The provision in section 38, that all moneys received from licenses upon vehicles; shall be placed to the credit of the street-repairing fund, wrould seem to refute the claim that the money from this source is, raised for general revenue, although it would not, necessarily, follow, even if it were required to-be placed to the credit of the general fund, that the purpose, of the law was exclusively the raising of general revenue, because no impediment exists to placing in one fund moneys intended for different purposes. So other moneys arising from licenses, though required to be placed to- the credit of the general fund, do not, by reason of that fact,, become general revenue. If revenue is necessarily beneficial to all the people within the jurisdiction in which it is raised, it may then be classed as general revenue; otherwise, it is special. In a general, popular sense, it may be said that improvement or repair in one portion of a city, *69 tends to the benefit of all portions, and that, in like sense, police supervision and protection as to things which may, if not supervised, become harmful, tends to the benefit of all citizens. But this cannot be affirmed to be true in a legal sense. It is not so necessarily. That the receipts from these licenses are devoted to the general revenue in the legal sense, is not made apparent.
It is urged, too, that the last clause of section 29 makes discriminations in favor of farmers marketing the products of their own farms, which are unjust, and that this invalidates the law. Such products ordinarily embrace the necessaries of life, without which the people, and, to some extent, domestic animals could not subsist, and it is not unfair to assume that this consideration had weight with the legislature in making the discriminations referred to. Other reasons may have been within the knowledge of that body which are not here disclosed, and do not occur to us. However, it is enough to say, that it is not shown that such discriminations are not within the legislative discretion. It may be added that absolute equality as to burdens, whether applied to taxes or other subjects of legislation, is not to be expected in our laws. The wisdom of man has not yet devised a system of equalizing burdens so perfect in its application and so thorough in its enforcement as to leave no room for adverse comment or criticism.
Section 11 of the law is objected to as inquisitorial, and in violation of the constitutional right by which the citizen is secure against unreasonable searches and seizures. The section provides that when the rates of license depend upon the receipts or profits of the business, or upon the amount of business done, etc., the applicant for license may be examined upon such matters and may be required to subscribe to an affidavit that he has, to the best of his knowledge and belief, truly answered all questions touching the amount of license. Any false statement is made a misdemeanor, punishable as provided in section 2. If this section is ascertained to be wholly void, then a like infirmity attaches to many sections of other laws now'in force. The first four chapters of the title *70 upon the subject of taxation (Revised Statutes, vol. 1, p. 524) and the practice which has grown up under them, furnish many examples of prying into the private business of the citizen, attended with inconveniences quite as marked as the requirements of section 11 of this law. A like objection is urged against other sections — those relating to the effect to be given certain testimony that may be received upon a proceeding to enforce the penalty, to the examination of places of business by city officers, in order to see that licenses are taken out and no business transacted but such as the license permits, etc., etc. As to these, it is enough to say that the questions sought to be raised are not in the cases before us. Though all of those sections were eliminated, the law would remain. They are not so interwoven with the sections under review as to invalidate them, even if held themselves to be invalid.
Whether the authority to enact laws of the character of the one in question shall be regarded as based upon the police power ot the government, or upon the taxing power, is, perhaps, not of the greatest importance, provided the power is found to exist. We have the best of authority for the oft-repeated aphorism that “ there is no magic in names.” The enactment provides for the regulation of relative rights, privileges and duties as between individuals, for the conservation of order, and the discouragement of pernicious employments, or of such as may become so, thus keeping its object apparently within the attributes of police power (Cooley on Taxation, 586); but we need not concern ourselves with nice and finely-drawn distinctions. Both the police and the taxing power, including power of assessment, are included within the general legislative power vested by our constitution in the general assembly. Of the police power, Redfield, C. J., in Thorpe v. Rutland and Burlington R. Co., 27 Vt. 140, observes: “ This police power of the state extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the state. According to the maxim, sic utere tuo ut alienum non Icedas, which is of universal application, it must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his *71 OAvn as not to inj ure others.” Again, he speaks of it as the poAver “by Avkich persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health and prosperity of the state, of the perfect right in the legislature to do which no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned.” Tiedeman, in his work on Limitations of Police Power, at page 194, has the folloAving: “ It will probably not be disputed that every one has a right to pursue in a lawful manner any lawful calling which he may select. The state can neither compel him to pursue any particular calling, nor prohibit him from engaging in any lawful business, provided he does so in a lawful manner. It is equally recognized as beyond dispute that the state, in the exercise of its police power, is, as a general proposition, authorized to subject all occupations to a reasonable regulation, where such regulation is required for the protection of public interests, or for the public Avelfarc.”
Questions germane to those brought in revieAV here, have been considered by this court in several cases, to which attention may briefly be called, in some of which the exactions are treated as direct taxes for revenue on occupations, in others as assessments on account of benefits, and in others as police regulations merely. The State v. Hibbard, 3 Ohio, 63, Avas an action of debt to recover the tax assessed upon the defendant as a practicing attorney. The same plaintiff v. Proudfit, same volume and page, Avas a like action to recover a tax against defendant as a physician. Judgment for plaintiff was rendered in each case. The State v. Gazley, 5 Ohio, 15, was likeAvise an action to recover a tax against the defendant, which had been assessed upon him as a practicing attorney. The tax Avas imposed by the court of common pleas by virtue of a laAV Avkich authorized such imposition. The court held that the tax w.as not a poll, but a faculty tax, and that it might be legally assessed by the legal tribunals. It is not shoAvn to what purpose the revenue so arising was devoted; but inasmuch as the courts could avail themselves of the poAver or not, it is a fair interference that the purposes were local. The *72 State v. The Judges, 21 Ohio St. 1, was brought to test the right of the judges of the court of common pleas of Hamilton county to exercise the powers conferred upon them by an act, the effect of which was to constitute the receipts derived from the offices of clerk, probate judge, sheriff, treasurer, recorder, and auditor of Hamilton county public moneys belonging to the county, and to provide that after paying the compensation of deputies, etc., as fixed by the judges of the court of common pleas, the salary of commissioner of costs and fees appointed by the judges, and stated sums to each of the officers named, the residue to be transferred to the general fund for the use of the county. The act was held to be of a local nature, the object not being taxation for the purpose of general revenue, but to limit and provide for the payment of the compensation of the officers named, and to reduce the expenses of official service to the public, and that the provision that the surplus shall be transferred to the general county fund did not render the act invalid. In the opinion, White, J., uses this language: “ The plain design of the act is not to tax those requiring official services for the purpose of general revenue, but to require payment of a reasonable compensation for the facilities afforded', and the services performed.” The law upheld in this case is clearly an • instance of the exercise of legislative power to levy taxes other than on property, and is so treated in the subsequent case of West. Union Telegraph Co. v. Mayer, 28 Ohio St. 521. See, also, Cincinnati Gas Light & Coke Co. v. The State, 18 Ohio St. 237, where an assessment on gas companies, according to the appraised value of their capital, was regarded as “ not a tax on property, but rather a charge upon individual corporations — artificial persons — and the business in -which they are engaged; ” “ and it by no means follows,” adds Brinkerhoff, J., “ that because the state is compelled to tax all property by a uniform rule, that it is, therefore, cut off from all power to lay assessments and charges for exceptional and special purposes coming clearly within the general legislative power conferred by the constitution upon the general assembly.”
The power of a city to regulate, by a license ordinance, places of amusement, was directly involved in the case of *73 Baker v. Cincinnati, 11 Ohio St. 534. The ordinance provided, among other things, that “ any person or persons who shall exhibit, or participate in exhibiting, for pay, in said city, any theatrical performance,” etc., without a license shall, for every offense, upon conviction, pay a fine of not less than five nor more than one hundred dollars and costs. The license fee placed upon theaters was from $100 to $500. The action was to recover back money claimed to have been illegally exacted by the mayor as a condition to granting a license. The court held that “ the money was not illegally exacted, and that the exaction was not in violation of any provision of the constitution of the state restricting the power of taxation vested in the general assembly.” In the opinion, Gholson, J., uses this language: “ We think that the power to prohibit certain things to be done, unless a license be obtained, and to charge for such license, in many instances of its exercise, stands on the same principle as an assessment. An assessment stands on a principle of benefit to property; a charge for a license may be made in view of the special inconvenience and expense to the government, for the benefit of the individual who asks for the license.” * * “ The power to authorize licenses is, in terms, untouched in the constitution, except in a particular instance, and how far, and to what extent, this power may' be used as a means of raising revenue, it is not necessary, nor proper that wc should inquire.”
The authority of a city to regulate market spaces, and to require payment of license fees, was involved in the case of Cincinnati v. Buckingham, 10 Ohio, 257. An ordinance of the city provided that no person should be licensed or permitted to occupy a place in any of the market places of the city, or in the streets contiguous, except upon making payment of twenty-five cents for every market day, and any one refusing to pay should forfeit five dollars and costs, to be recovered before the mayor. Buckingham had refused to pay, and had been fined by the mayor. This court held the ordinance lawful, and that it could be enforced by fine. The reasoning of the judge who delivered the opinion (Lane, C. J.) is to the effect that the spaces in and about the market required police supervision; the “ due regulation ” of the market required the *74 expenditure of money, mostly for the benefit of the sellers; the spaces had to be paved and kept in repair and olean, and as to all these expenses it was but just that those who received the benefit should help defray the cost. To the claim that the city’s demand was a tax upon the sale of the commodities brought to market, he answered that it was rather a price demanded for accommodations provided. The case of Cincinnati v. Bryson, 15 Ohio, 625, is still more to the purpose. The defendant in that case was a drayman, who had been convicted and fined for refusal to take out a license under an ordinance which required owners of vehicles to pay a license fee. Drays drawn by one horse were assessed three dollars. An owner who refused or neglected to obtain a license, was, by the terms of the ordinance, to be subjected, on conviction, to a fine not exceeding ten dollars and costs, to be recovered before the mayor, or other proper officer, for every vehicle, and every day that he continued to run the vehicle without license was a néw offense. This court sustained the conviction. The following from the able opinion of Birchard, J., indicates the view taken by the coui’t: “ The court in that case (referring to Boston v. Schaffer, 9 Pick. 419) held that it was proper that towns, when put to expense by the exercise of particular employments, should be compensated. So in this case, the employment of drays, hacks, omnibuses, and other heavy vehicles, upon their pavements, cause no inconsiderable amount of expenditure to the city, in the way of repairing the streets and alleys. It is manifest to every one, that, in a large city, vehicles of this description cause great destruction to the public ways; far greater than the usual, ordinary travel of citizens otherwise employed. There is, therefore, no injustice in exacting a reasonable portion of the expenses which such special occupations cause to the community; and those who enjoy the special privilege, can refuse to bear a reasonable portion but with an ill-grace. But aside from all this, it is unquestionable that the power to license and regulate drays, etc., authorized the assessment and collection of a fine from any one running such vehicle without a license.” * * * “ But it is' again urged that the whole ordinances are void, because they are in re *75 strain! of trade, and levy a tax. If this were the true character of the ordinances, they could not be sustained. We, however, do not view them in any such- light. The employment gives the drayman or hackman special privileges, which he enjoys to the prejudice of the city, in the injury necessarily done to her streets and pavements, to an amount far greater than any benefit to be derived from the price of the license, excluding the necessary burden of supervision.” It will be noted that the expression of the learned judge in respect to restraint upon trade and the levying of a tax, referred to an ordinance, not to an act of the general assemblju The authority of the foregoing decisions, cited from the Ohio reports, cannot be affected by the fact that since they were rendered a new constitution has been adopted and is in force, unless it be made apparent that the po wer to license and regulate, or to tax occupations, has been limited by the later constitution. This it is believed, cannot be shown. Save only as controlled by section 18 of the schedule, which relates to intoxicating liquors, the power to license and to tax occupations is as broad under the present constitution as under that of 1802.
Nor is this exercise of power as to vehicles generally an unreasonable exercise of it. The ownership of the streets is in the city, and the duty is imposed to keep them open, in repair and free from nuisance. This involves, in many ways, the expenditure of large amounts of money. It calls for constant vigilance as to all the streets, and for extensive pavements upon the more important ones. These, ordinarily, are laid at the expense of the owners of the abutting property. If neglected they soon wear out, and then, in most cases, another burden is imposed on the same property for repaving. It matters not that a particular property-owner has not kept a vehicle, and has not had direct agency in the destruction of the street. If enough pressure is brought to procure the city’s order for a new pavement, he must, nolens volens, pay the assessment, and meantime pay the general tax upon his property for the making of repairs to such of the streets as the authorities see fit to repair. Expense of early renewal of the pavement is to be avoided only by careful and constant repairs, *76 made necessary by constant use on the part of those who run vehicles upon the street, and the better the pavement and the more carefully it is kept in repair, the more useful and convient it becomes for those who use it. They thus receive a special, direct benefit by the original outlay and by the repairs from time to time, and by such use impose burdens upon the property-owners and the public at large. A proportion of them, those who own taxable property, contribute in taxes toward the repair fund (and may be among those whose property is subject to assessment for the original improvement) ; but many do not, and thousands of property-owners use no vehicles of any kind. Why should not these favored ones pay a small sum toward making good that which they wear out ? Especially wearing on the streets are the heavy loads transported by those in occupations similar to that of plaintiffs in error Marmet and Hill, and the heavier the load, the greater the number of horses necessary to propel it. Hence the license fee is properly graded according to the number of horses used. The principle involved is not different from that upon which the establishment of toll-roads' and the authority to collect tolls of those travelling upon them, and to grade the amount charged in proportion to damage inflicted or use made by the traveller, is sustained. Then, too, there is force in the point made by counsel that special police regulation is needed upon the streets of large cities to prevent accidents, to protect pedestrians at crossings, to prevent fast and reckless driving, and to prevent blockades.
Dealers in second-hand articles, and keepers of junk shops, may properly be classed with pawn-brokers and keepers of loan offices, who are required to obtain license because of imposing special burdens. As to them it is well known that, in large cities, the supervising power of the police is necessary, inasmuch as thieves and receivers of stolen property often resort to such places to pledge or otherwise dispose of their ill-gotten gains. Launder v. Chicago, 111 Ill. 291. Involving-like need of police supervision in large cities is the business of livery and sale stables, where, when in unscrupulous hands, frauds upon innocent customers and strangers are of so fre *77 quent occurrence as to have become matter of common knowledge. And license upon such pursuits are required, not as taxes upon property, but on occupations. Municipality v. Dubois, 10 La. Ann. 56.
As answer to the complaint that the mode of enforcing collection of the license fee by fine is unreasonable and illegal, it is enough to say that the power to so punish is distinctly sustained by this court in Cincinnati v. Buckingham, and in Cincinnati v. Bryson, supra, and we follow those decisions. Whether or not imprisonment ought to be added, does not arise in this record, and need not be discussed. Those cases, as also Baker v. Cincinnati, supra, involve the power of the general assembly to confer authority on the municipal governments to legislate upon the subjects treated of. That the assembly itself would lack power to legislate directly upon those subjects, we presume would not be claimed.
By way of conclusion, without undertaking to lay down any general rule as to the power to license or tax occupations, and confining our holding to the necessities of the cases before us, we think it may safely be affirmed, upon both principle and authority, that power to regulate by license, and to compel payment of a reasonable fee, may be maintained where a special benefit is conferred at the expense of the general public, or the business imposes a special burden on the public, or where the business is injurious to, or involves danger to the public. And Relieving that the exactions required by the sections of the law in question here fairly come within the rule thus stated, we hold them to be valid.
We find no error in the records.

Judgments affirmed.