Spiegelberg, J.
The plaintiff brings this action to recover the firs! installment of rent falling due under a written lease for one year and six months. The lease was executed on March 22, 1920. The defendant sets up as a defense that he was in possession of the premises under a lease commencing April 1, 1919, that the lease upon which the action is brought provides for a rental which represents an increase of more than twenty-five per cent over the rent as it existed one year prior thereto and that the rent demanded is unjust, unreasonable and oppressive, and that the agreement under which the same is sought to be recovered is oppressive. The plaintiff rested its case upon the proof of the agreement and the non-payment of the rent.
This case involves the validity and construction of chapter 136 of the Laws of 1920, which took effect on April 1, 1920. That law is one of the twelve statutes, to wit, chapters 130 to 139, 209 and 210, which were recently passed by the legislature to give relief to tenants from the grave situation which has arisen in this and other cities due to the ever-increasing rents. Chapters 136, 137 and 139 form the keystone of this programme. Chapter 136 deals with actions at law and the other two with summary proceedings. These laws were called forth by the present emergency. They apply only to cities of the first class and cities in the county of Westchester, and are limited in duration until November 1,1922.
The situation which confronts the vast majority of our population due to the shortage of housing facilities is well known. The courts may take judicial notice thereof without supporting evidence. People v. Schweinler Press, 214 N. Y. 395, 404. Judicial cognizance may be taken of all matters of general knowledge. Muller v. State of Oregon, 208 U. S. 412, 420.
*580 The legislature has incorporated its views of the situation in the statute. Section 1 reads: “ Unjust, unreasonable and oppressive agreements for the payment of rent having been and being now exacted by landlords from tenants under stress of prevailing conditions whereby the freedom of contract has been impaired and congested housing conditions resulting therefrom have seriously affected and endangered the public welfare, health and morals in certain cities of the state, and a public emergency existing in the judgment of the legislature by reason thereof, it shall be a defense to an action for rent accruing under an agreement for premises in a city of the first class or in a city in a county adjoining a city of the first class occupied for dwelling purposes, other than a room or rooms in a hotel, lodging house or rooming house, that such rent is unjust and unreasonable and that the agreement under which the same is sought to be recovered is oppressive.”
This act permits the defendant in an' action at law for the recovery of rent to set up the defense that the rent is unjust and unreasonable and that the agreement under which the same is sought to be recovered is oppressive. It does not give the court the power to fix the rent or make a new agreement for the parties. The court upon proper facts shown may hold that the agreement is oppressive. That is the extent of its power. Section 2 reads: “ Where it appears that the rent has been increased more than twenty-five per centum over the rent as it existed one year prior to the time of the agreement under which the rent is sought to be recovered, such agreement shall be presumptively unjust, unreasonable and oppressive.”
It is perhaps unnecessary to point out that this section does not fix the limit of rent increase within *581 one year at twenty-five per cent. It is merely a rule of evidence. Ordinarily where an affirmative defense is pleaded, it is incumbent upon the defendant to establish the facts in support thereof. By this law, where the rent increase has been less than twenty-five per cent within one year, the tenant still has the affirmative to prove its oppressiveness. Where it is more than twenty-five per cent the landlord must show its reasonableness.
Section 3 of the statute gives the plaintiff an opportunity to plead and prove a fair and reasonable rent for the premises and recover judgment therefor, or to institute a separate action for the recovery thereof.
The act in question is constitutional. Its validity rests, first, upon the police power of the state, and, secondly, upon the equally broad principles of public policy.
There has never been a time when the state was denied the power to interfere with the rights of private property where the safety, health and morals of the community demanded it. The police power for the protection of the public welfare has recently been vastly extended. Public use does not mean a direct use by the entire public. In Strickley v. Highland Boy Gold Mining Co., 200 U. S. 527, the court, commenting on Clark v. Nash, 198 id. 361, says at page 531: “ In discussing what constitutes a public use it recognized the inadequacy of use by the general public as a universal test. While emphasizing the great caution necessary to be shown, it proved that there might be exceptional times and places in which the very foundations of public welfare could not be laid without requiring concessions from individuals to each other upon due compensation which under other circumstances would be left wholly to voluntary consent. ’ ’
Forward looking legislation has broadened state *582 control over private property to meet social needs, and the courts have likewise advanced and sustained the broadening legislation. It may be of interest to point out that in People v. Williams, 189 N. Y. 131 (decided 1907), the prohibition of night labor by women was held to be unconstitutional as affecting the freedom of contract, while in People v. Schweinler Press, 214 N. Y. 395 (decided 1915), legislation of the same kind was upheld. In 1909 the limitations upon the use of land by restricting the height of signs on buildings were held to be unconstitutional in People ex rel. Wineburgh Advertising Co. v. Murphy, 195 N. Y. 136, while substantially the same law was upheld in 1915 in People ex rel. Publicity Leasing Co. v. Ludwig, 218 id. 540.
In the famous case of Munn v. Illinois, 94 U. S. 113, the court held, in substance, that when the owner of property devotes it to a use in which the public has an interest, he grants to the public an interest in such use, and must, to the extent of that interest, submit to be controlled by the public for the common good. Chief Justice Waite, in that case, says at page 124: “ When one becomes a member of society, he necessarily parts with some rights or privileges which, as an individual not affected by his relations to others, he might retain. ‘A body politic,’ as aptly defined in the preamble of the Constitution of Massachusetts, ‘ is a social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good.’ This does not confer power upon the whole people to control rights which are purely and exclusively private, Thorpe v. R. & B. Railroad Company, 27 Vt. 143; but it does authorize the establishment of laws requiring each citizen to so conduct himself, and so use his own property, as not unnecessarily to injure another. This is the very essence of *583 government, and has found expression in the maxim sic utere tuo ut alienum non laedas. From this source come the police powers, which, as was said by Mr. Chief Justice Taney in the License Cases, 5 How. 583, ‘ are nothing more or less than the powers of government inherent in every sovereignty * * * that is to say, * * * the power to govern men and things.’ Under these powers the government regulates the conduct of its citizens, one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good.”
And again at page 125: “ This brings us to inquire as to the principles upon which this power of regulation rests, in order that we may determine what is within and what is without its operative effect. Looking, then, to the common law, from whence came the right which the Constitution protects, we find that when private property is ‘ affected with a public interest, it ceases to be juris privati only.’ This was said by Lord Chief Justice Hale more than 200 years ago, in his treatise De Portibus Maris, 1 Harg. Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to malte it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use; but, so long as he maintains the use, he must submit to the control.”
In Noble State Bank v. Haskell, 219 U. S. 104, the *584 constitutionality of an act of the legislature of the state of Oklahoma was attacked whereby an assessment of one per cent of a bank’s average daily deposits was levied for the purpose of creating a depositors’ guaranty fund. The purpose of the fund was to secure repayment of deposits of banks which may become insolvent. The plaintiff bank claimed that it was solvent and that it could not be called upon to contribute towards securing or paying the depositors in other banks, and that the state had no right under the Constitution to take any of its property for private uses. The court, at page 111, referring to the police power of the state, uses this very significant and sweeping language: “It may be said in a general way that the police power extends to all the great public needs. Camfield v. United States, 167 U. S. 518. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare. ’ ’
In German Alliance Ins. Co. v. Kansas, 233 U. S. 389, it appeared that the state of Kansas passed a law regulating and controlling the business of fire insurance companies. Fire insurance in the state of Kansas had not been in any way licensed by the state and received no privilege whatever from the state. The court at page 405 sums up the opposition to the statute as follows: “ The basic contention is that the business of insurance is a natural right, receiving no privilege from the State, is voluntarily entered into, cannot be compelled nor can any of its exercises be compelled; that it concerns personal contracts of indemnity against certain contingencies merely. Whether such contracts shall be made at all, it is contended, is a matter of private negotiation and agree *585 ment, and necessarily there must be freedom in fixing their terms.”
Referring to the police power, the court, at page 413, says: “ Counsel states that this power may be exerted to ‘ pass laws whose purpose is the health, safety, morals and the general welfare of the people.’ The admission is very comprehensive. What makes for the general welfare is necessarily in the first instance a matter of legislative judgment and a judicial review of such judgment is limited. ‘ The scope of judicial inquiry in deciding the question of power is not to be confused with the scope of legislative considerations dealing with the matter of policy. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance.’ Chicago, Burlington & Quincy Railroad Co. v. McGuire, 219 U. S. 549, 569.”
The court, after reviewing- in detail many of the prior cases upholding the police power of the state, enunciates its views at page 415, as follows: “ The principle we apply is definite and old and has, as we have pointed out, illustrating examples. And both by the expression of the principle and the citation of the examples we have tried to confine our decision to the regulation of the business of insurance, it having become ‘ clothed with a public interest,’ and therefore subject ‘ to be controlled by the public for the common good.’
“ If there may be controversy as to the business having such character, there can be no controversy as *586 to what follows from such character if it be established. It is idle, therefore, to debate whether the liberty of contract guaranteed by the Constitution of the United States is more intimately involved in price regulation than in the other forms of regulation as to the validity of which there is no dispute. The order of their enactment certainly cannot be considered an element in their legality. It would be very rudimentary to say that measures of government are determined by circumstances, by the presence or imminence of conditions, and of the legislative judgment of the means or the policy of removing or preventing them.”
It needs no argument to show that at the present time buildings are affected by a public interest and that to serve the welfare, safety, health and morals of the people the unrestricted private use of buildings by the owner may be and should be regulated by the legislature. In some respects such regulation by the state is more vital than in the case of other necessities of life. Individuals may cut down on wearing apparel, they may stint on food, but they must have a roof over their heads. Whether the legislature could have passed more efficacious laws, whether it acted upon sound economic principles, is not for the courts to determine. Granting legislative power, the policy must be left to the discretion of the legislature. German Alliance Insurance Co. Case, supra.
The fact that the statute restricts the free exercise of the power to make contracts is no objection. There is no absolute freedom of contract. It is subject to restrictions necessary in the interest of general welfare.
Professor Freund, in his well-known treatise on Police Power, discussing its extension to the impairment of the obligation of contract, says at page 582: “ Thus it appears that the earning power of capital *587 may or may not be validly impaired, according asi it has not or has been fixed by entering into definite contracts. The legislature may operate upon future contracts but not upon those already in existence. This difference is a matter of constitutional policy; a contract is, as a general rule, of limited duration and in the course of time the debtor will be discharged from its operation. His hardship is temporary, and as he has undergone it voluntarily, it is deemed better (provided' the contract is not immoral, or in its inception contrary to public policy) that he should suffer, than that the faith in the security of promises should be shaken. ’ ’
In Chicago, Burlington & Quincy Railroad Co. v. McGuire, 219 U. S. 549, 567, the court says: “ It was recognized in the cases cited, as in many others, that freedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.” And on page 568 it is said that the right to make contracts “ is subject also, in the field of state action, to the essential authority of government to maintain peace and security, and to enact laws for the promotion of the health, safety, morals and welfare of those subject to its jurisdiction.”
In Muller v. State of Oregon, 208 U. S. 412, 421, it is said: “ The general right to contract in relation to one’s business * * * is not absolute and extending to all contracts, and that a State may * * * restrict in many respects the individual’s power of contract.”
*588 We have arrived at a point where in an emergency there are no property rights which are not subject to the police power of the state. The legislature is the exclusive judge of the existence of an emergency. Every person who carries on a business emerges from his privacy and owes an obligation to the community in the conduct of his business. This is especially true in the case of real estate, as the usé and control of lands from the earliest times has been most persistently associated with, and applied to be subject to the public interest. See article by Edw. A. Adler, entitled “ Labor, Capital and Business at Common Law,” published in 29 Harvard Law Review.
Irrespective of the police power, the statute is valid upon the principle of public policy. The right of freedom of action is limited when it interferes with public policy. Our entire law of usury depends upon that principle. Another famous instance is the doctrine of equity of redemption. Under the bond the lender is entitled to the property immediately upon default, but equity steps in to relieve the borrower of the harshness of the contract and permits him to redeem. Whenever a transaction, perfectly regular in its external form, lacks the absolute consent which is regarded as essential, equity will give relief. As stated in 2 Pomeroy’s Equity Jurisprudence (3d ed.), section 943: “ The equitable conception of true consent assumes a physical power of the party, an intellectual and moral power, and that he exercised these powers freely and affirmatively.”
The same author, in section 948, says: * ‘ Whenever one person is in the power of another, so that a free exercise of his judgment and will would be impossible, or even difficult, and whenever a person is in pecuniary necessity and distress, so that he would be likely to *589 make any undue sacrifice, and advantage is taken of such condition to obtain from him a conveyance or contract which is unfair, made upon an inadequate consideration, and the like, even though there be no actual duress or threats, equity may relieve defensively or affirmatively. ’ ’
In 1 Story Equity Jurisprudence (14th ed.), section 339, the learned author says: ‘ ‘ Circumstances also of extreme necessity and distress of the parties, although not accompanied by any direct restraint or duress, may in like manner so entirely overcome his free agency as to justify the court in setting aside a contract made by him on account of some oppression or fraudulent advantage or imposition attendant upon it.”
And in 13 Corpus Juris, 409, the rule is stated as follows : ' ' Where one party has taken advantage of another’s necessities and distress to obtain an unfair advantage over him, and the latter, owing to his condition, has encumbered himself with a heavy liability or an onerous obligation for the sake of a small or inadequate present gain, equity will relieve him. So agreements between lender and borrower are closely scrutinized because they are not always at arms length.”
Innumerable instances may be cited and a wealth of authorities is given in the text books above quoted. Even where at the time of the transaction parties were permitted to make their own agreements as to interest, in default of the existence of usury laws, the courts decline to enforce hard and unconscionable bargains for excessive interest. Brown v. Hall, 14 R. I. 249; Miller v. Cook, L. R. 10 Eq. 641. And where a waiver of the equity of redemption is made a part of the mortgage itself the courts refuse to enforce such a provision. 27 Cyc. 1373, and cases cited.
*590 Over 100 years ago it was said in Wood v. Abrey, 3 Madd. 417, 423: “ With respect to value, mere inadequacy of price is of no more weight in equity than at law. If a man who meets his purchaser on equal terms negligently sells his estate at an under value, he has no title to release in equity. But a Court of Equity wiE inquire whether the parties reaUy did meet on equal terms; and if it he found that the vendor was in distressed circumstances, and that advantage was taken of that distress, it wiE avoid the contract.”
In Baxter v. Wales, 12 Mass. 365, the court had be-. fore it an onerous contract for hiring of cattle. The opinion tersely says: “ If they (the contracts) are unreasonable and oppressive, the principles of the common law will give relief against them, as in other cases of that description.”
A very interesting discussion of the subject is found in Van Dyke v. Wood, 60 App. Div. 212: “ The principle upon which men are relieved from their contracts procured by duress has been greatly extended in recent years. In the time of Lord Coke no one would have been permitted to avoid his contract for duress, unless the duress was such as not only to put him in fear of iUegal imprisonment or great bodily harm, but went so far as to be something that a man of ordinary firmness would not be able to resist. No possible loss to his land or property would be sufficient to enable him to avoid a contract which he had made to prevent it. (Bacon Abr. tit. Duress A.) But gradually and by slow degrees the strictness of that rule was abated until finaHy it had come to be the rule of law in this country, although perhaps not in England, that where one is presented with the contingency of serious loss or damage to his property or of a submission to an extortionate claim, if he pay the claim or make the contract *591 which is extorted from him it is not to be considered a voluntary act, and it may be set aside on the ground of duress. (Vyne v. Glenn, 41 Mich. 112; Harmony v. Bigham, 12 N. Y. 99; Hatter v. Greenlee, 26 Am. Dec. 370, note pp. 376, 377.)”
The court then proceeds to support its views with numerous authorities.
In the recent case of Carr v. Sacramento Clay Products Co., 170 Pac. Rep. 446, 450, the court set aside what it denominates an apparent contract upon the ground that it was in violation of section 1575 of the Civil Code of California which provides that undue influence consists, among other things, in the taking of “ a grossly oppressive and unfair advantage of another’s necessities and distress.” And a similar statute of the state of Oldahoma was upheld in Snyder v. Rosenbaum, 215 U. S. 261.
It is, therefore, apparent that the doctrine is firmly imbedded in our jurisprudence that where one takes an undue advantage of another’s situation and circumstances and thereby obtains an unfair and unconscionable contract the court may grant relief. This condition applies to the making of leases at the present time. Landlords and tenants cannot contract on an equal basis. The tenant is compelled by sheer necessity of having a place to dwell in to agree to any conditions that may be imposed by the landlord. As the statute well says, the freedom of contract is impaired. Chapter 136 does nothing else but what equity has decreed should be done in similar cases. It permits the equitable defense of oppression to be set up in an appropriate case. That under our procedure equitable defenses may be interposed in actions at law is unquestioned. The remedy given by the legislature is not an innovation. It only puts in statutory form what has *592 been the law from time immemorial. The legislature has determined by enactment what is public policy.
I am, however, of the opinion that the statute does not apply to the case under consideration. The lear.e which fixed the rent was made prior to April 1, 1920. The law is prospective in its effect and not retroactive. The statute does not merely work a change of procedure, but it affects a substantial right by creating a new defense. At the time of the making of the lease the rights of the parties were fixed by law. The plaintiff had the absolute right to rely upon the recovery of the rent as it became due, subject only to the defenses as they existed at the time of the making of the lease. If the legislature thereafter passed a law which compelled the plaintiff to prove certain facts and invested the defendant with a defense which he theretofore had not possessed, new and substantial elements were injected into the relations of the parties and substantial rights were modified. In Jacobus v. Colgate, 217 N. Y. 235, it was held that to supply a remedy where previously there was none, is to create a right of action and cannot have any retroactive effect. As said by Cardozo, J., at page 242: “ What we emphasize now is the distinction between statutes which merely change the procedure for the enforcement of a right and statutes which supply a remedy by which a right for the first time becomes enforceable.”
By parity of reasoning this is the situation here. It is the general rule that statutes will be construed to operate prospectively only. As stated in Union Pacific R. R. Co. v. Laramie Stock Yards Co., 231 U. S. 190, 199: ‘ ‘ The first rale of construction is that legislation must be considered as addressed to the future, not to the past. The rule is one of obvious justice and prevents the assigning of a quality or effect to acts or conduct which they did not have or did not contemplate when *593 they were performed. The rule has been expressed in varying degrees of strength but always of one import, that a retrospective operation will not be given to a statute which interferes with antecedent rights or by which human action is regulated, unless such be ‘ the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.’ ”
In Sayre v. Wisner, 8 Wend. 661, it is said: “ It is a general rule that no statute is to have a retrospect beyond the term of its commencement. It may have such retrospect, but not so as to take away a right of action which the plaintiff was entitled to before the time of its commencement. 6 Bac. Abr. 370. A statute never ought to have such a construction as to divest a right previously acquired, if it be susceptible of any other, giving it a reasonable object and full operation without such construction. ’ ’
To the same effect is New York & Oswego Midland R. R. Co. v. Van Horn, 57 N. Y. 473, 477: “ It is always to be presumed that a law was intended, as is its legitimate office, to furnish a rule of future action to be applied to cases arising subsequent to its enactment. A law is never to have retroactive effect, unless its express letter or clearly manifested intention requires that it should have such effect. If all its language can be satisfied by giving it prospective operation, it should have such operation only.”
Among the numerous other authorities may be cited Rhodes v. Sperry & Hutchinson Co., 193 N. Y. 223; Winfree v. Northern Pacific Railway Co., 227 U. S. 296; Cameron v. United States, 231 id. 710.
From the foregoing it is clear that the rule is firmly fixed that no retrospective operation can be given to a statute unless the language employed and the intention manifested is so clear that it will admit of no other construction, and this rule is applicable with *594 peculiar force where the statute, if retrospective, would impair the obligation of contracts or interfere with vested rights. There is nothing in the language of chapter 136 which compels retrospective construction to be given to the statute, nor is such a construction indicated to be the manifest intention of the legislature so as to supply the insufficiency of the language. The word “ shall” in the expression “it shall be a defense to an action ” indicates simply the future tense, and this must be given weight. Huttlinger v. Royal Dutch West India Mail, 180 App. Div. 114, 116.
The fact that the conditions which brought about the emergency were in existence prior to April 1, 1920, cannot turn a prospective statute into a retrospective direction. The legislature by its enactment established a particular date from and after which the defense given by the statute may be availed of. If it were otherwise it would be impossible to determine for how long a period prior to the passage of the act this statutory defense may be invoked. A law should not be construed as retrospective which introduces a new policy and radically changes an existing law. Winfree v. Northern Pacific R. R. Co., supra, 302.
If this statute is held to apply to a contract made prior to its passage it would change the substantial rights of the parties and make a new contract between them.. This would be a clear violation of the constitutional provisions against the impairment of the obligation of contracts. To repeat the quotation from Freund on Police Power, supra, ‘ ‘ the legislature may operate upon future contracts, but not upon those already in existence.” It is a well-established rule of statutory construction that where a statute is capable of two constructions, one of which would render it invalid and the other valid, the construction which will uphold its validity must be adopted.
*595 The defendant, therefore, cannot succeed upon his defense. He relied entirely upon the defense given by the statute. If I am correct in my views herein expressed, a contract which calls for an unconscionable rent may be avoided in certain cases, even without the aid of the statute, but the evidence in this case falls far short of the proof required for such a purpose.
It may not be amiss to state that the statutory defense may be set up against excessive rents where the tenancies are monthly, or from month to month. In tenancies of that class the contract is renewed from month to month and though the same rent may have been paid prior to April 1, 1920, the exaction of the rent after April 1,1920, is not based upon the contract made prior to that date, but upon a renewal of the contract from month to month. In other words, by operation of law, a new and separate contract for rent is made monthly.
The plaintiff is entitled to judgment for the amount demanded in the complaint.
Judgment for plaintiff.